**Donald Rayburn JONES, Petitioner,**

v.

**INSTITUTIONAL CLASSIFICATION COMMITTEE, FIELD UNIT # 8, Respondent.**

**Donald Rayburn JONES, Petitioner,**

v.

**SUPERINTENDENT AND UNIT CLASSIFICATION COMMITTEE OF HARRISONBURG CORRECTIONAL UNIT # 8, Respondent.**

**Civ. A. Nos. 73–C–55–H, 73–C–65–H.**

United States District Court,
W. D. Virginia,
Harrisonburg Division.

April 2, 1974.

---

4. Tentative Draft, December 1966 § 3.4(a). Unchanged in final draft approved by House of Delegates, February 19, 1968.

708

Burnett Miller, Asst. Atty. Gen., Richmond, Va., for respondent.

OPINION and JUDGMENT

DALTON, District Judge.

Petitioner Donald Rayburn Jones, a Virginia prisoner, complains of the action taken by the Institutional (Unit) Classification Committee (hereinafter, ICC) at Correctional Field Unit # 8, Linville, Virginia, on July 26, 1973, which resulted in his being removed from the study-release program at Unit # 8 and transferred to White Post Correctional Field Unit # 7, White Post, Virginia. Jones' petition in Civil Action No. 73–C–55–H, which asks for both injunctive relief restoring him to his prior status and monetary damages for the loss of privileges he has suffered as a result of this allegedly unlawful action, was originally filed in the United States District Court for the Eastern District of Virginia, and by order of that court on October 30, 1973, was transferred to this court. Civil Action No. 73–C–65–H, which also was transferred to this court from the Eastern District, on November 15, 1973, reiterates the complaints made in No. 73–C–55–H, with the additional allegation that the ICC's action constituted an unlawful abduction and kidnapping. Jurisdiction will be deemed to have been attained by

virtue of the provisions of 42 U.S.C. § 1983, 28 U.S.C. § 1343.

The facts are essentially as follows: Petitioner was received into the Virginia Division of Corrections on February 17, 1969, on a charge of armed robbery. He was subsequently transferred to Unit # 8 on September 18, 1972, to participate in the Blue Ridge Community College program. During his participation in that program, his academic marks were high, he was elected editor of the college newspaper, and he was thought to be highly motivated and well adjusted. Participants in the college program are afforded an exceptional amount of freedom—being transported to the college campus where they attend classes and then return to the unit in the evening. They are allowed free movement around the campus during the day. According to Unit # 8 Superintendent David F. Prouty, who has submitted an affidavit in evidence, sometime in February, 1973, he began receiving rumors which indicated that petitioner, in addition to his school work, had become heavily involved in marijuana dealing and usage in the Harrisonburg area. Supt. Prouty says that he questioned petitioner about this, and Jones freely admitted that he had smoked marijuana outside the unit, and made critical statements concerning the marijuana laws. Prouty received additional information that petitioner had lost heavily in poker games, approximately $300 in losses, but had been able to pay off these debts very quickly. Rather sketchy information was also received linking Jones to a theft of drugs in the community.

Based on the above information, Supt. Prouty concluded that Jones should no longer be considered trustworthy and notified him in writing on July 25, 1973, that he was to be brought before the. ICC the next day for a hearing on the Superintendent's request that petitioner be removed from the educational release program. The ICC, comprised of H. L. Campbell, Chairman, and R. E. Pratt and G. A. Reynolds, Jr., met on July 26, 1973. Supt. Prouty appeared and read from a memorandum that he had prepared,[1] outlining the information received against Jones, and stated why he felt Jones should be removed from the program. Jones was given the opportunity and did cross-examine Supt. Prouty concerning this information, after which Prouty left the hearing. After the hearing, the Committee recommended that petitioner be removed from the educational release program. It based its decision upon the belief that Jones had presented no evidence to contradict Supt. Prouty's report, because he had continued to use marijuana despite earlier warnings and because it was brought out that Jones had reason to believe that an inmate was going to attempt an escape and Jones had not apprised authorities of this.[2] Jones was subsequently transferred to Unit # 7 immediately after his ICC hearing.

In his motion in opposition to the respondents' motion for summary judgment, petitioner alleges that his transfer was unlawful and unreasonable for the following reasons:

(a) The only witness against the petitioner admitted possessing no first-hand knowledge of petitioner's guilt on any charge presented to the ICC. Petitioner was never confronted with his actual accusers and was never allowed to cross-examine them.

(b) Petitioner had no one to advise or assist him at any point in the ICC reclassification process.

(c) The hearing was not recorded or transcribed despite petitioner's willingness to record the hearing on his own equipment at his own expense.

(d) Petitioner was not allowed to call voluntary witnesses from the community where his transgressions were allegedly committed.

---

1. A copy of this memorandum is contained in respondents' exhibits.

2. A copy of the ICC's recommendation is contained in respondents' exhibits.

(e) Supt. Prouty's statement was the only evidence presented against petitioner, and the ICC did not require that any accusation therein be proven. The ICC erroneously was of the opinion that petitioner was obligated to disprove Prouty's allegations.

(f) The twenty-four hour notice prior to the hearing was insufficient to prepare a proper defense against the charges and no delay was granted by the Superintendent or the ICC members despite petitioner's repeated requests for such.

(g) At the conclusion of the ICC hearing, petitioner was immediately transferred to a higher security (the same day) without the advice and consent of the Central Classification Board in Richmond and without the proper documentation required by the Director's officer prior to the transfer of any inmate to a position of higher security.

Jones further contends that the haste surrounding his reclassification is evidence of premeditation and malice aforethought on the part of the unit authorities. He says that his reclassification has resulted in a change in his security status, loss of educational opportunity, a loss of eligibility for furlough, and it has decreased his chances of parole.

█ This court does not sit as a prison review agency, and its authority with respect to the actions of state penal officials is limited to providing redress for constitutional deprivations by such officials. Ferrell v. Huffman, 350 F. Supp. 164 (E.D.Va.1972). With regard to the actions of institutional classification committees, the scope of review is normally limited to deciding whether the ICC action taken was arbitrary or capricious, Ferrell v. Huffman, *supra,* or punitive in nature,[3] Lloyd v. Oliver, 363 F.Supp. 821 (E.D.Va.1973).

██ With respect to the procedures employed in an ICC action, the court will inquire only as to whether certain minimal due process standards have been met. "Those standards, in turn, are flexible and may vary from case to case depending upon the nature of the decision to be made and the extenuating circumstances involved." Wesson v. Moore, 365 F.Supp. 1262 (E.D.Va.1973). The ICC certainly is not required to follow rigid courtroom procedure.

█ This court will state from the outset that it believes that the ICC at Unit # 8 was entirely justified, and certainly acted neither arbitrarily or capriciously, in recommending the transfer of petitioner. Supt. Prouty had statements from several sources that Jones was engaged in drug trafficking, Jones himself admitted his use of marijuana outside the unit, and according to Mr. Campbell, Chairman of the ICC, Jones refused to either admit or deny the allegations presented by Supt. Prouty at the hearing, and gave generally elusive answers to questions. Because of the nature of the program that petitioner was enrolled in, respondents had every right to expect exemplary behavior from Jones. The record on which the ICC action was based clearly reflects a legitimate question as to Jones' trustworthiness. The decision to recommend that petitioner be removed from the educational release program and that his security status be changed was an appropriate attempt to forestall any future abuse by Jones of the trust which had been placed in him and therefore cannot be deemed as purely punitive or, indeed, arbitrary in nature.

The court's inquiry cannot terminate with this conclusion, however. The introductory paragraph of the Division Guidelines For Corrections' Personnel (hereinafter, Division Guidelines)[4], pro-

---

3. *Punishment* within a unit is the sole function of the institution's Adjustment Committee, and certain procedural safeguards apply thereto. Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971). .

4. While a copy of the Division Guidelines has not been introduced into the record, petitioner has cited relevant portions extensively throughout his pleadings.

mulgated as a result of the decision in Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), and which has been cited by petitioner, reads:

> The concept of "constitutional procedural due process" has come to play a major role in the Adjustment Committee and Institutional (Unit) Classification Committee. In some instances, courts have found that procedural due process rights have not been given to inmates appearing before the Adjustment and Classification Committees. As a result, the procedures outlined herein have been developed to insure a union standard of procedure for all institutions in the Division of Corrections, and these procedures have been approved by the courts. It should be kept in mind, however, that procedural formalities will not shield arbitrary action, because the concept of due process means more than formal steps or procedures to be followed before an inmate may be punished or transferred. Due process in the Adjustment and Classification Committees means fairness. It means giving the inmate a fair and impartial hearing, and often giving him the benefit of the doubt. Due process means treating the inmate as a human being and treating him as you would want to be treated if you were in his place. (p. 5)

It is precisely the concern mentioned above—that the reclassification procedure be marked not only by the formalities of due process, but by the appearance of a fair and impartial procedure —that seems lacking in the instant case.

■■ The court will discuss each of Jones' specific allegations in the order in which they were presented. First, as to the claim that he was never faced with his actual accusers. Supt. Prouty's report which was read at the ICC hearing states that he had talked with two inmates, and the wife and girl friend of these two inmates (who resided in the Harrisonburg area), and that each of them either directly or inadvertently linked petitioner to the use and sale of marijuana. The court is not of the opinion that petitioner had a right to cross-examine those "accusers" who were private citizens from outside the unit whose presence at the ICC hearing could not be compelled by the unit authorities. See Wesson v. Moore, 365 F. Supp. 1262, 1267 n.10 (E.D.Va.1973).[5]

As to those "accusers" who were inmates, however, and therefore subject to control by the penal authorities, the court is of the opinion that they should have been present at the ICC hearing, absent extenuating circumstances, such as in Nimmo v. Simpson (Civil Action 163–73–R) (Mem.Dec.) (E.D.Va. July 19, 1973), where the identification of the informant might have caused him to be placed in grave bodily danger. This principle was spelled out in Wesson v. Moore, supra, 365 F.Supp. at 1268:

> . . . the presumption must, in the absence of extenuating circumstances, be in favor of the opportunity of an accused inmate to confront and cross-examine the witnesses against him, even in a non-punitive, ICC reclassification hearing, where the witnesses in question are subject to control by the penal authorities. The burden is on penal authorities to explain why such opportunity should not be provided in a given circumstance.

The court has been informed that the two named inmate informants in Supt. Prouty's report had escaped from Unit #8 on July 18, 1973, and were not recaptured until August 10, 1973. Since they were not under the control of penal authorities at the time of petitioner's

5. Petitioner now contends that the two women who Supt. Prouty interviewed are willing to testify that the inferences drawn from their statements are incorrect, but this is immaterial as far as the scope of review by this court of the ICC's action is concerned. The court does not sit to review the credibility or weight of the evidence presented at ICC hearings, even though the record before the ICC may have contained false or mistaken information. Wesson v. Moore, supra, 365 F. Supp. at 1267 n. 9.

ICC hearing, their attendance obviously was not required. As to those additional unnamed informants who gave information made a part of Supt. Prouty's report, however, they should have been present for petitioner to cross-examine, absent the aforementioned extenuating circumstances.[6]

■ Petitioner next complains that he had no one to assist or advise him at any point in the ICC reclassification process. The pertinent part of the Division Guidelines reads as follows:

This type of hearing [ICC] will follow the same procedures as outlined for the Adjustment Committee hearings except that inmate advisors and the assistance of an attorney will not be made available to the inmate. Institutional (Unit) personnel must be provided to advise and assist inmates in these classification proceedings. (p. 14)

In response to an interrogatory of this court, petitioner states that he did not actually request assistance from any institutional official—but he maintains that someone should have been appointed to assist him anyway. The court does not read the Guidelines as mandating the appointment of a specific individual to assist an inmate. This is especially so in the case at hand, where petitioner was able to speak to the unit superintendent the day prior to his hearing, met with two unit counselors the same day, and was provided with a staff member who acted as an impromptu observer during the actual ICC hearing.

■ While the court is not of the opinion that petitioner's right to due process was seriously infringed by the refusal of the ICC chairman to allow petitioner to tape record the proceedings

(at his own expense), the better practice would seem to be to allow such records. When such a reclassification hearing, based upon a supervisory complaint, is held, the Division Guidelines specify that they shall be conducted with the same procedures as are outlined for Adjustment Committee hearings.[7] Since the common practice is for Adjustment Committee hearings to be recorded, the court sees no reason why petitioner should not have been permitted to record his ICC hearing, especially when he offered to do so at his own expense. As none of petitioner's complaints relate to any matter which would be elucidated if a recording had been made, however, the court cannot see how petitioner, in this instance, was prejudiced by the lack of such a recording. Absent a showing of some sort of invidious discrimination, penal authorities' failure to comply with their own regulations, as is arguably the case in this instance, constitutes at most a violation of state law, but does not state a constitutional claim cognizable by this court. Almanza v. Oliver, 368 F. Supp. 981 (E.D.Va.1973).

■ The Division Guidelines, which were promulgated for the Virginia Division of Corrections as a whole, present some procedural uncertainties when applied, as here, to units where inmates are participants in special programs that take them outside the prison walls and out into the community. For instance, the Guidelines specify that at Adjustment Committee hearings (and consequently, at the type of ICC hearing involved here) an inmate may offer the testimony of voluntary witnesses, either inmate or correctional personnel, in his behalf—but no mention is made of private citizens outside the prison. This is undoubtedly so because the Guidelines

6. The Division Guidelines themselve clearly state at p. 15 that "[w]hen matters not contained in the inmate's record folder are introduced to the [ICC] Committee, it will be necessary to call witnesses before the Committee to establish the truth of those matters before they may be considered." Petitioner has alleged, and respondents have not denied, that

the material in Supt. Prouty's report had not previously been made a part of his record, at least prior to July 24, 1973.

7. With the aforementioned exception that inmate advisors and the assistance of an attorney will not be made available to the inmate.

express a concern that the witnesses who do testify be limited to those whose testimony is relevant to the offense charged. The Guidelines (at p. 9) specify that only those witnesses whose testimony is irrelevant to the offense charged, or is repetitious and cumulative in nature, should be excluded. In response to an interrogatory of this court, petitioner has stated that he desired to call six witnesses on his behalf: three professors from the Blue Ridge Community College, and three students. Petitioner says that he was told by Supt. Prouty that he could not call *any* outside witnesses, and for that reason he did not contact any of the six individuals prior to his ICC hearing. Utilizing the standard in the Guidelines, that only those who can testify directly concerning a reported violation should testify, it appears that all but one of the prospective witnesses could have properly been excluded. The sixth, a student, was with petitioner on the dates that he allegedly was involved in the theft of drugs in Augusta County, and according to petitioner could have refuted Supt. Prouty's inference that he had been so involved if she had been allowed to testify at the ICC hearing. The court is of the opinion that this witness, assuming that she would have been willing to testify, should have been allowed to do so at the ICC hearing.

 Petitioner next contends that the ICC erred in utilizing a standard whereby petitioner was required to disprove Supt. Prouty's report, either by giving evidence to contradict it or by giving the ICC reason to disbelieve the report. Once again, petitioner was not being tried on any charges—he was only expected to justify why he should be allowed to remain in the special program that he was in, in the face of the reports concerning him. Even in Adjustment Committee hearings an inmate is expected to admit or deny the truth of the charges against him (p. 10 of the Guidelines). According to the affidavit of H.

T. Campbell, the ICC chairman, Jones would neither admit nor deny the allegations, and responded with "evasive answers." He did, according to Campbell, admit using marijuana while at the unit.

 The twenty-four hour written notice accorded Jones prior to his ICC hearing is in accord with the notice requirements for Adjustment Committee hearings (at p. 9 of the Guidelines). After considering the record, the court is convinced that no great detriment was caused petitioner by the refusal of Unit # 8's superintendent and the chairman of its ICC to grant a "continuance," and according the court concludes that petitioner has not been denied due process in this respect.

 Lastly, petitioner says that within thirty minutes of his ICC hearing, his security status had been increased, and he was in the back of a truck bound for Unit # 7. According to the affidavit of F. M. Hite, an Assistant Superintendent of the Bureau of Correctional Units in Richmond, Supt. Prouty called him immediately after the ICC reached its decision, advised him of the circumstances and requested that Jones be transferred to a different unit. As Mr. Hite's responsibilities include the assignment of inmates within the Bureau, he authorized the transfer of Jones to Unit # 7, according to his affidavit filed in this case.[8] Mr. Hite's explanation for the fact that petitioner was immediately transferred to Unit # 7 on the same day as his ICC hearing is that Unit # 8 does not have a great deal of external security, and it was imperative that Jones be transferred because his opportunities for escape were numerous as long as he remained at Unit # 8. The normal procedure for such transfers, according to Hite, is for the Unit ICC to send its minutes and recommendations to the Bureau of Correctional Units Central Classification Committee in Richmond, which reviews the recommendations before making appropriate reassignments.

---

3. Mr. Hite's affidavit was submitted as a supplement to respondents' motion for summary judgment.

While the court doubts the necessity of effecting petitioner's transfer in the summary fashion in which it was conducted,[9] it will not attempt to second-guess this administrative action. This is done with some reservation.[10]

### RELIEF

Injunctive relief, in the nature of an order that petitioner be returned to his prior status at Unit # 8, is not called for. Jones freely admitted using marijuana while at Unit # 8, which is a violation of state law, is not of prison regulations. The educational release program in which he was enrolled was a special one, and respondents had every right to expect exemplary behavior from petitioner while he was in it.

Nor are mandatory damages warranted. No claim can be made against the State of Virginia in this instance. *See* Wesson v. Moore, *supra*, 365 F.Supp. at 1265. The items for which petitioner seeks compensatory damages: loss of educational opportunity, an increase in security status, a loss of eligibility for furlough, and decreased chances of parole—all stem from the transfer recommendation of the ICC, which as this court has stated before was not entirely arbitrary or capricious, nor was it totally lacking a foundation in what can be termed "reasonable good faith."

The court would not hesitate to hold respondents personally liable for damages for having denied petitioner some of his rights to procedural due process, were there not the extenuating circumstances present in this case. While it is doubtful that respondents can make any claim that they acted as they did in reasonable good faith reliance upon any standard prison operating procedure, which is a defense to a' claim for compensatory damages in a § 1983 suit of this sort, Skinner v. Spellman, 480 F.2d 539 (4th Cir. 1973), it is just as doubtful that petitioner can show that they were acting in derogation of some then known standard prison operating procedure. The finding of this court that inmate informants should have been present at petitioner's ICC hearing for him to cross-examine was largely based upon the decisions in Nimmo v. Simpson, *supra*, which was decided only a week before petitioner's hearing, and Wesson v. Moore, *supra*, which was decided three months later. There was no specific commandment in existence at the time that petitioner be allowed to present witnesses on his behalf from the community, and the Guidelines do not specifically cover the point. In addition, there is nothing in the record that indicates that petitioner informed respondents of the identity of any of his anticipated witnesses, or of the possible relevancy of their testimony.

Punitive damages, which may also be awarded in a § 1983 action, must be premised upon a finding of actual malice, Skinner v. Spellman, supra, of which there is no evidence in this case.

For the above reasons, respondents' motion for summary judgment on the issues of damages and injunctive relief is hereby granted in both cases which have been consolidated herein.

The clerk is directed to send certified copies of this opinion and judgment to petitioner and to counsel for respondent.

---

9. Petitioner says that it was customary, and cites an example, for escaped inmates to be held at Unit #8 in an increased security status pending trial and sentencing on the escape charge.

10. The Division Guidelines state (at p. 16) that "[i]t is essential that all transfers of an inmate to a higher degree of security be accompanied by proper documentation." Respondent has submitted no such documentation save for a copy of the ICC recommendation.

There can be no doubt, despite Mr. Hite's assertion to the contrary, that petitioner was indeed placed in a higher degree of security after his transfer. At Unit #8, he was a trusty and a participant in the educational release program; at Unit #7, he became a "gunman."