**G. Gordon LIDDY et al.**

v.

**George C. WILKINSON, Warden, Federal Correctional Institution, Danbury, Connecticut.**

Civ. No. B–75–290.

United States District Court,
D. Connecticut.

April 29, 1976.

G. Gordon Liddy, pro se.

Peter A. Clark, Asst. U. S. Atty., New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

G. Gordon Liddy and Richard Stover, both presently incarcerated at the Federal Correctional Institution, Danbury, Connecticut, seek injunctive relief to prevent recurrence of actions taken against them by FCI officials. Their present grievances arose during the pendency in this Court of an action they previously brought challenging FCI practices concerning prisoners' mail. See *Stover v. Carlson*, 413 F.Supp. 718 (D.Conn.1976). Petitioners claim adverse action was taken in retaliation for their resort to federal court. An evidentiary hearing was held on April 1, 1976. While the evidence does not support the claim of retaliation, the hearing did disclose aspects of institutional practice that warrant correction in the future.

Shortly after midnight on Saturday, February 21, an apparently minor episode involving Liddy occurred during the taking of an inmate count at Rhode Island House, where Liddy's cell is located. The following morning Liddy was formally charged in a

written incident report with interfering with the taking of a count, insolence toward a staff member, and conduct which interferes with the orderly running of the institution. As required by Bureau of Prisons Policy Statement 7400.5D (July 7, 1975), a copy of the report, with a description of the incident, was given to Liddy. Section 7(b). The operations supervisor on duty that morning decided to transfer Liddy from his regular quarters to that portion of another building known as New Hampshire East, which contains three tiers of cells used for prisoners in administrative detention and disciplinary segregation. Prison officials considered Liddy's status to be administrative detention. Liddy was placed in a cell on the second tier and moved two days later, Monday, to a cell on the third tier.[1] The following day Liddy was accorded a hearing by the Institution Discipline Committee, found not guilty of the charges, and returned to his regular cell. After his return, his case manager demanded that he return his copy of the case incident report, and he complied.

Liddy does not claim that the charges were made in retaliation for his federal court suit. He does contend that the decision to place him in administrative segregation pending hearing on the charges was a retaliation. Neither side presented testimony from the operations supervisor. The associate warden testified that on Monday he reviewed the incident report and concurred in the decision to place Liddy in administrative detention because of the allegations in the report and because of prior unspecified episodes that had occurred at Rhode Island House, some of which involved Liddy, though they did not result in charges against him. The Policy Statement provides that an inmate may be placed in administrative detention pending various events, including "a hearing for a violation

---

1. Apparently the first tier, which has the best cell conditions in the wing, is generally used for inmates in administrative detention, the second tier is reserved for holdover prisoners in the custody of the United States Marshal, and the third tier is used for disciplinary segregation, although these assignments are not inflexible.

When Liddy was transferred, the first tier had no available cell, other than a stripped cell reserved for uncontrollable inmates, and place of assignments was based on cell availability and not intention to inflict punishment. Informing a prisoner of such circumstances might well alleviate understandable suspicions.

of institution rules or regulations," when the inmate's "attitude and conduct indicate that his continued presence in the general population poses a serious threat to life, property, himself, staff, other inmates or to the security of the institution." Section 11(a)(1). The associate warden considered "security of the institution" to include the orderly running of the institution and concluded that under all the circumstances Liddy's presence in general population pending his hearing did pose a serious threat to the orderly running of the institution.

This Court is not inclined to second guess this judgment, though it seems to represent a somewhat strained application of the regulation. The regulation is concerned primarily with pre-hearing detention in those situations of obvious gravity such as serious threat to life or property. There is a danger that "serious threat" to the "security of the institution" can too easily become a catchall for any conduct that displeases prison officials, with the result that brief detention could be imposed as punishment even if the charges were not proven. Nevertheless, the risk of a breakdown in prisoner respect for staff authority is a legitimate concern of prison staff and in the absence of any indication that pre-hearing detention has been routinely or arbitrarily imposed, the decision to require it in this instance will not be faulted. Nor is there a sufficient basis for the inference that the decision was made in retaliation for Liddy's federal lawsuit.

However, proper complaint is made about the procedures concerning administrative detention. Whenever an inmate is placed in administrative detention, including pending a hearing for violation of institution rules or regulations, the Policy Statement requires:

A memorandum detailing the reason for placing an inmate in Administrative Detention will be prepared and given to members of the inmate's unit or team, with a copy to the Operations Supervisor

of the Administrative Detention unit. A copy of this memorandum will also be given to the inmate provided institutional security is not thereby compromised. Section 11(a)(1).

It is undisputed that such a memorandum was not prepared in this instance, nor is any claim made that institutional security justified not providing Liddy with his copy of such a memorandum.

■ As the associate warden explained, officials at FCI, Danbury, have considered that the incident report, required by § 7 of the Policy Statement, satisfies the memorandum requirement of § 11. That interpretation must be rejected. The incident report contains details concerning the inmate's alleged violation of institution rules or regulations. If that document alone could justify pre-hearing detention, then such detention could be routinely ordered whenever violations are alleged, instead of only in the "serious threat" situations permitted by § 11(a)(1). That section establishes a rather strict standard for imposing pre-hearing detention. The memorandum requirement of that section provides assurance that a responsible official will make an informed judgment that the strict standard for prehearing detention has been met and requires the official to articulate the reason for finding the standard met. Adherence to the memorandum requirement helps insure that pre-hearing detention is ordered only when permitted under the Policy Statement, and also provides administrators with a written record from which they can determine that the standards of the Policy Statement are not being diluted.[2]

In this instance the reason for pre-hearing detention involved prior episodes at Rhode Island House, some of which allegedly involved Liddy. Identifying these circumstances in the memorandum required by § 11(a)(1) will help insure that the reason given actually is the contemporaneous basis for the decision to require pre-hearing

---

2. The fact that, under the Policy Statement, the memorandum justifying administrative detention receives a distribution within the institu-

tion different from the distribution of the incident reports also indicates that two different documents are required. See §§ 7(a), 11(a)(1).

detention, rather than a subsequent rationalization when explanation is required.

■ Strict adherence to requirements concerning special forms of custody cannot be dispensed with simply because prisoners are already within the confines of a penal institution. Degrees of custody have a significant impact upon prisoners, and in an environment where staff has virtually total control over those within the institution, procedural regularity assumes special importance. See *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ The associate warden did not seek to justify the request for Liddy to surrender his copy of the incident report, and that practice also is inconsistent with the Policy Statement. Section 7, providing for the inmate to receive a copy, makes no provision for his return of it, regardless of the outcome of the hearing. The Policy Statement does require that in the event of a not guilty finding, the incident report will be expunged from the inmate's file, §§ 8(h), 9(d)(1), 9(f), but the inmate is nonetheless entitled to keep his copy to document frequency of accusation.

Stover's complaint concerns his transfer from his work assignment as clerk in the institution's law library to the paint shop. He was notified of the change on January 7, 1976, two weeks after a courtroom hearing of his mail complaint. When he complained to the head of the record office, who supervises the law library, he was told that the transfer decision had been made by higher authorities. Though Stover informed his supervisor that his transfer would result in a closing of the law library, he was nevertheless reassigned on the 7th, and the library did close for a brief period of time.

The associate warden explained that the transfer resulted from a request from the paint shop for inmates in minimum custody status, who could be assigned to work outside the institution. Various departments furnished names, and department heads were contacted to see which men under their supervision could be spared. Stover, in minimum custody, was one of those reassigned. While he complains that the reassignment was abrupt and accomplished without the usual discussion with an inmate's case manager, such discussion, though desirable, is not a requirement, and the legitimacy of the need for men to be assigned to outside painting jobs negates the inference of retaliatory action.

■ However, the timing of the reassignment, at the expense of letting the law library close, is not defensible. There apparently was no urgent need for Stover to work outside the institution. He did not receive such an assignment until January 12. While this Court has recently ruled that the law library at FCI, Danbury, with materials mandated by Bureau of Prisons Policy Statement 2001.2B, is adequate to satisfy constitutional requirements, *Stover v. Carlson,* 408 F.Supp. 696 (D.Conn.1976), that decision assumed that the library would not be unnecessarily closed. Extraordinary circumstances might on occasion justify brief closing of the library, but the facts here fall far short of any true emergency.

The claims for relief based on retaliatory action are not established. However, plaintiffs are entitled to a judgment declaring: (1) The memorandum of reason for administrative detention required by § 11(a)(1) of Policy Statement 7400.5D must be prepared notwithstanding the preparation of an incident report; (2) An inmate furnished a copy of an incident report may not be required to return it; and (3) In the absence of justifying circumstances, personnel assigned to the law library should not be reassigned until suitable replacements have been identified and made available to keep the library open during customary hours. The Clerk is directed to furnish a copy of this decision to the warden of FCI, Danbury, who in turn will bring it to the attention of appropriate staff officers.