**Theodore GREEN, Petitioner,**

v.

**Raymond NELSON, Warden, Federal Correctional Institution, Danbury, Connecticut, and the U. S. Parole Commission, Respondents.**

**Civ. No. B–77–291.**

United States District Court,
D. Connecticut.

Nov. 15, 1977.

---

Mark R. Forcum and Robert Kochenthal, Law Student Interns, with Judith P. Resnick, Dennis E. Curtis, Stephen Wizner and Mary F. Keller, Jerome N. Frank Legal Services Organization, New Haven, Conn., for petitioner.

Frank H. Santoro, Asst. U. S. Atty., New Haven, Conn., for respondents.

## MEMORANDUM OF DECISION

DALY, District Judge.

Theodore Green, the petitioner in this habeas corpus action, was to be paroled from the Federal Correctional Institution in Danbury, Connecticut on September 7, 1977. He remains in prison today due to a series of administrative actions taken by prison officials and the United States Parole Commission following an altercation with members of the prison hospital staff on August 8, 1977. This Court holds the federal correctional system's response to the events of that day constitutionally inadequate, and therefore orders the petitioner released on parole as originally planned.

On the morning of August 8, 1977, petitioner awoke in the prison hospital, where

he was undergoing treatment for a badly sprained ankle. Hoping to relieve the pain in that injured limb, he approached the pharmacy window to request his prescribed medication. The denial of his request precipitated an incident allegedly involving obscene language and physically threatening gestures on the part of the petitioner, and the exercise of some force by members of the hospital staff. A medical officer filed an incident report, and later that day the petitioner was placed in administrative detention to await the outcome of disciplinary proceedings.

Disciplinary hearings at F.C.I. Danbury are held on two levels. The Unit Disciplinary Committee (UDC) makes the initial determination of the inmate's guilt, and applies minor sanctions. If it appears that major sanctions are required, *i. e.*, segregation, withholding or forfeiture of statutory good-time, transfer to another institution, or a recommendation that the U. S. Parole Commission rescind or retard parole, the UDC must refer the case to the Institution Disciplinary Committee (IDC). Bureau of Prisons Policy Statement 7400.5D(8) (July 7, 1975). On August 10, petitioner attended the UDC meeting. Finding him guilty as charged, the UDC referred his case to the IDC. At a "hearing" held on August 12, the IDC found the prisoner guilty of three prison violations, withdrew thirty days of statutory good-time, continued the special detention, and recommended that the prisoner be transferred. Petitioner was released from detention one week later. On August 30, the U. S. Parole Commission retarded the petitioner's parole on the basis of the IDC report, and following a "rescission hearing" held on October 17 determined that the petitioner should remain in prison until the expiration of his sentence in the Fall of 1978.

The task before this Court is not to determine the actual events of that August morning, but to ascertain whether the petitioner's due process rights were violated. The facts will be discussed in the context of the particular legal question to which they relate. This opinion addresses the following issues: I) the extent of the petitioner's obligation to exhaust his administrative remedies; II) the legality of the petitioner's administrative detention; III) the sufficiency of the prison officials' investigative efforts prior to the IDC hearing; IV) the propriety of the IDC procedures, with particular reference to (A) the right to present evidence and (B) the sufficiency of the IDC record; V) the permissibility of the procedural strictures established by the U. S. Parole Commission to govern parole rescission hearings; and VI) the appropriate form of relief.

## I. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Subsequent to the decision of the IDC, petitioner appealed to the Acting Warden without success. Petitioner then applied to the Regional Director of the Federal Bureau of Prisons, and on September 16, 1977 Director Gerald Farkas rejected petitioner's request for relief. Mr. Green then filed an appeal on the national level with the Assistant Director, Office of General Counsel and Review, Federal Bureau of Prisons. This was the final step in the administrative appeals process. Bureau of Prisons Policy Statement 2001.6A(6) (Oct. 18, 1974). No decision has been received from the General Counsel. The question thus becomes whether the absence of a response from the national reviewing body of the Bureau of Prisons should retard a decision on the merits of the petitioner's constitutional claims. For purposes of deciding whether a judicial determination of the petitioner's rights is premature, it will be assumed that the administrative remedies available to the petitioner have not been exhausted.[1]

---

1. It should be noted initially that it is questionable whether the petitioner has in fact failed to exhaust his administrative remedies. Following the petitioner's filing of an appeal from the decision of the Regional Director, the Office of General Counsel and Review must send the petitioner a receipt of appeal. The counsel's office then has twenty working days to reply on the merits. The failure to reply within that twenty-day period constitutes a denial of the

The basic text on the issue of administrative exhaustion by federal prisoners in this district is *Kochie v. Norton*, 343 F.Supp. 956 (D.Conn.1972). Although finding there that the petitioners had failed to exhaust the remedies available within the prison system, the court noted that "[c]onsideration should always be given to the gravity of the matter complained of and the realistic availability of a prompt and effective administrative remedy." *Id.* at 960. The matter before this Court is grave indeed. Absent the incident of August 8, 1977 and subsequent administrative actions, the petitioner would no longer be imprisoned; any further administrative delay may impact directly upon the petitioner's freedom. Such exigent circumstances alone might justify a finding that the administrative remedy is inadequate. See *Downes v. Norton*, 560 F.Supp. 1151, 1152 n.1 (D.Conn. 1973).

■ There are other factors as well that require this Court's intervention. The petitioner has posed some constitutional questions beyond the competence of correctional officials to consider and arguably beyond their authority. There is little room among the review criteria established by the Bureau of Prisons for these constitutional considerations. *See* Bureau of Prisons Policy Statement 7400.5D(10)(a)–(c) (July 7, 1975). This is as it should be. The articulation of due process requirements is more appropriately the function of the courts, and "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Finally, the effectiveness of any remedy provided by the General Counsel's office is questionable. That agency has no authority to declare procedures unconstitutional, to order new, improved parole proceedings to be conducted by the U. S. Parole Commission, or to require the

petitioner released. *Cf. McNeese v. Board of Education*, 373 U.S. 668, 675, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Damico v. California*, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967). Thus the remaining Bureau of Prisons alternative to judicial intervention is inadequate.

■ No mention has been made of efforts to contest through the U. S. Parole Commission's own appellate process the decision rescinding parole. *See* 18 U.S.C. § 4215 (Supp. VI 1976). But the reasons discussed above for finding the exhaustion of Bureau of Prisons procedures unnecessary in this case apply also to the procedures of the U. S. Parole Commission. Furthermore, the continued failure to the U. S. Parole Commission to adopt constitutionally mandated procedures covering parole rescission hearings, see, e. g., *Metz v. Norton*, Civ. No. B–74–89 (D.Conn. April 30, 1976); *Williams v. United States Board of Parole*, 383 F.Supp. 402 (D.Conn.1974), prompts this Court to doubt the likelihood of relief through the Commission's appellate procedures. *Cf. Catalano v. United States*, 383 F.Supp. 346, 349 (D.Conn.1974). Thus the petitioner need travel no further down administrative avenues. The questions raised in his petition are properly before this Court.

## II. ADMINISTRATIVE DETENTION

Petitioner entered administrative detention on August 8, 1977 and emerged eleven days later. He claims that the prison officials failed to make a finding that "his continued presence in the general [prison] population poses a serious threat to life, property, himself, staff, other inmates and to the security of the institution . . .," as required by Bureau of Prisons Policy Statement 7400.5D(11)(a)(1) (July 7, 1975). *See Liddy v. Wilkinson*, 413 F.Supp. 724 (D.Conn.1976). In *Liddy*, the petitioner was charged in a written incident report with

---

appeal. Bureau of Prisons Policy Statement 2001.6A(6) (Oct. 18, 1974). See *Maguire v. Wilkinson*, 405 F.Supp. 637, 639 (D.Conn.1975). Petitioner's final appeal is undated, see Peti-

tioner's Exhibit 12, and no receipt has been brought to the Court's attention. Thus on the record it is impossible to determine whether the twenty-day period has passed.

obstructing a prisoner count, acting insolently toward a prison staff member, and interfering with the orderly running of the institution. The operations supervisor on duty the next morning placed Liddy in administrative detention. The court refused to find the supervisor's conduct improper, "absent indication that pre-hearing detention has been routinely or arbitrarily imposed . . . ." *Id.* at 726.

■ At the hearing before this Court, the investigative officer testified that at the time he placed Mr. Green in administrative detention he did not consider the petitioner to be a threat to the security of the institution. He explained that he was following what he perceived to be an institutional practice: the automatic administrative detention of any prisoner allegedly involved in a physical altercation with prison staff. Unlike the occurrence giving rise to the detention in *Liddy*, the original incident in the present case allegedly involved threats and some physical force. The conclusion that petitioner would have us draw—that a policy of placing in administrative detention an inmate who has been involved in a scuffle with prison staff violates prison regulations and the inmate's due process rights—goes too far. The systematic detention of those prisoners involved in incidents of physical violence with staff is not arbitrary. Rather, such a policy is based on the recognition that the heightened tensions resulting from such violent incidents must not be allowed to circulate in the flammable prison atmosphere. The initial decision placing the petitioner in administrative detention therefore violates neither the institutional regulations nor the constitutional guarantee of due process.

## III. REASONABLE INVESTIGATION

The next issue before this Court is whether prison regulations were violated and the petitioner's rights to due process denied by the alleged failure of the prison officials to conduct a reasonable investigation of the

incident. The case was assigned to Correctional Supervisor Brown, who discussed the incident with the petitioner in the late afternoon of August 8. After obtaining the inmate's statement, the investigator is required to "thoroughly investigate the incident. He should talk to witnesses, and summarize their statements . . . . All steps and actions taken should be recorded on the incident report." Bureau of Prisons Policy Statement 7400.5D(7)(b) (July 7, 1975).

■ Lieutenant Brown failed to conduct such a thorough investigation. He spoke with only the petitioner and, possibly, the charging officer.[2] He failed to question other participants and witnesses, including three prison employees mentioned in the incident report and one inmate. Although the names of all these individuals may not have been known to the investigator when he commenced the investigation, most were easily discoverable. In failing to abide by the prison regulations, Lieutenant Brown deprived the disciplinary process of evidence compiled when memories were still fresh, evidence that would be available at the subsequent hearing even if the declarant were unable to attend. His report influenced the IDC decision, and the administrative appeals in turn depended on the IDC factual determination. The integrity of the prison disciplinary process thus depends in large part on the thoroughness of the supervisor's mandated investigation. By neglecting to conduct any real investigation, Lieutenant Brown violated departmental regulations, and thus denied due process to the petitioner. *See Giampetruzzi v. Malcolm*, 406 F.Supp. 836, 840 (S.D.N.Y.1975). In light of this determination, the Court declines to consider the petitioner's claim that the investigation was constitutionally inadequate even in the absence of a regulatory requirement.

## IV. THE IDC PROCEEDINGS

At the UDC hearing on August 10, the chairman informed the petitioner that his

---

**2.** Lieutenant Brown testified that he telephoned Mr. Gilbert, the hospital employee who filed the incident report, after 5:00 P.M. on August

**8.** Mr. Gilbert, however, did not remember Lt. Brown's call and testified that he went home when his shift ended at 4:00 P.M.

case was being transferred to the IDC, and provided him with a list of his procedural rights before that body. The list included the right to call witnesses. In response, petitioner requested the attendance of the F.C.I. Danbury employees who had witnessed the incident. The UDC chairman explained that the petitioner need not formally request the presence of the F.C.I. staff members already mentioned in the incident report because the IDC would automatically consider their testimony. Relying on this representation, the petitioner requested in writing the presence of only a single inmate witness.

During the IDC hearing on August 12, petitioner learned that the one witness he had formally requested was on furlough. Nevertheless, the petitioner, who was still administratively detained, chose to go forward with the hearing. The petitioner reiterated his request that members of the hospital staff testify, and was refused due to his failure to list them on the witness request form. Petitioner then asked that another inmate witness testify. Petitioner had not mentioned this prisoner in his formal request for witnesses because he had not known that the inmate had viewed the incident. This request was also refused.

Near the close of the IDC proceedings, the chairman asked the petitioner to leave the room. He then telephoned the prison hospital and spoke with the charging officer and two staff witnesses, whom the petitioner had specifically requested earlier in the hearing. A fourth hospital employee requested by the petitioner had changed shifts and was unavailable. Although the two other IDC members were present during the calls, neither joined the conversations; instead, each relied upon the chairman's summary of the discussions when deciding against the inmate. The petitioner was then summoned back into the room and told of the decision. There is a factual dispute whether the prisoner was told of the telephone calls and their contents. No written record was made of the calls.

This IDC scenario violates the prison's own regulations and the petitioner's right to due process in a staggering variety of ways.

## A. The Right to Present Evidence

In *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court ruled that an inmate has the constitutional right to call witnesses and present documentary evidence in his defense during prison disciplinary proceedings that may result in "substantial" deprivations of the prisoner's liberty. However, the Court also recognized the authority of prison officials to prohibit the presentation of evidence, through testimony or written statements, that would be "unduly hazardous to institutional security and correctional goals." *Id.* In refusing to find an absolute right to present witnesses, the Supreme Court in *Wolff* articulated two major concerns: speed and security. Allowing the prisoner to ask innumerable questions to a long list of witnesses would hinder "the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Id.* In addition to keeping the hearing "within reasonable limits," the *Wolff* Court meant to provide prison officials with the discretion "to refuse to call witnesses that may create a risk of reprisal, or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* Accordingly, prison regulations now provide that the IDC Chairman "will call those witnesses he deems reasonably available and necessary for an appreciation of the circumstances surrounding the charge. Repetitive witnesses need not be called." Bureau of Prisons Policy Statement 7400.5D(9)(c)(3) (July 7, 1975). Prison regulations also prohibit the calling of witnesses and the presentation of documentary evidence by the inmate if doing so would "jeopardize or threaten institutional security." *Id.*

The government argues that the Supreme Court provided prison authorities with broad discretion when applying the *Wolff* criteria, discretion so broad that a more than cursory review by this Court would be

improper. The government cites *Baxter v. Palmigiano*, 425 U.S. 308, 322, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), in support of its position. In that case, however, the Supreme Court was concerned with the refusal of prison officials to allow confrontation and cross-examination of adverse witnesses. Here, we are dealing with an inmate's right to call witnesses on his own behalf, a right that stands on a "different footing." *Id.* Also, the specific issue before the Supreme Court in *Baxter* was whether the Court of Appeals could find the refusal by prison officials to allow confrontation and cross-examination was unjustified in the absence of a written explanation. The decision thus dealt with the duty to provide written justifications. In the present case, this Court will evaluate the official conduct not on the basis of the administrative record alone, but also with regard to the reasons subsequently offered by the government. To recognize an immunity from review in this case would elevate the disciplinary committee chairman into the final arbiter of the prisoner's due process rights, and would vitiate much of the *Wolff* Court's efforts to conform correctional practice to constitutional principles. There would be little reason for the Supreme Court to go to such lengths in defining a prisoner's rights, if it did not intend to create a means of judicially enforcing them. *Wolff v. McDonnell, supra*, 418 U.S. at 597–98, 94 S.Ct. 2963 (Douglas, J., dissenting in part).

■ At the UDC hearing on August 10, the petitioner requested orally that the IDC summon the staff members mentioned in the incident report. He omitted their names from the written form not through any fault of his own, but because the UDC chairman had explained that to do so would be unnecessary. The petitioner requested in writing that Mr. Vanacore, an inmate who had witnessed the incident, also be allowed to testify. Mr. Green reiterated his requests at the IDC hearing two days later. The IDC chairman contacted by telephone most of the hospital staff involved in the incident, but failed to reach Mr. Lash, who had been transferred to the evening shift and thus was unavailable at the time of the hearing. Similarly, the chairman informed the petitioner that Mr. Vanacore was on furlough, and thus was unavailable. Petitioner then decided to go forward in the witnesses' absence, rather than delay the hearing. The government suggests that by choosing to continue the petitioner waived any right to complain about the committee's failure to call the witnesses. This position fails to consider the petitioner's status as an administrative detainee. To find a voluntary waiver in this situation would force the petitioner to choose between prolonged administrative detention and the abandonment of his right to present evidence—an impermissible dilemma.

■ The solution lies in assuring at least that the requested witness submit a written statement to the IDC before leaving the institution. Prison rules already state that "[u]navailable witnesses *may* be asked to submit statements." Bureau of Prisons Policy Statement 7400.5D(9)(e)(3) (July 7, 1975) (emphasis added). The issue here is whether the IDC *must* collect written statements from requested witnesses who are available at the time of the inmate's request, but who will be unavailable at the time of the hearing.[3] First, because prison officials alone know when staff are scheduled to work, and when an inmate is expected to leave the institution, they alone

**3.** The prisoner's refusal of staff representation before the IDC does not change the basic issue. If a staff representative had been appointed, he might well have obtained the unavailable witnesses' statements. The prisoner's failure to utilize this service, however, should not be read as a waiver of procedural rights. A prisoner may reject representation for reasons other than mere indifference to the outcome of the proceedings. Indeed, the petitioner in the present case did ask for a particular staff representative, and refused representation only when he learned that his first choice was unavailable. Furthermore, even if a staff representative had been appointed, there is no guarantee that he would have obtained the unavailable witnesses' written statements. It is this very guarantee of official action that concerns the Court.

are capable of determining ahead of time whether the witness will be unavailable. Second, administrative confinement makes it difficult for the prisoner to contact witnesses, even if he knows of the upcoming absence. Finally, the added administrative burden on the disciplinary process is minimal in comparison to the deprivation of liberty that may result. Absent justification rooted in correctional policy, prison officials have the affirmative duty to collect written statements from witnesses whose presence is requested by an administrative detainee, but who prison authorities know, or should know, will be unable to attend the hearing. The failure to do so constitutes a denial of due process. In this case, the government justifies the absence of testimony or written statements from Mr. Lash and Mr. Vanacore on the mere fact of unavailability. Therefore the failure to obtain the statements violated the petitioner's Fifth Amendment rights.

Petitioner asked the IDC to summon three staff members, in addition to Mr. Lash, to testify at the August 12th hearing. This request was denied, but IDC Chairman Moore telephoned them at the hospital during the proceedings held in Mr. Green's absence. According to the respondents, the limited conversations held with the three staffers were sufficient to support the chairman's conclusion that their testimony would be merely cumulative, and thus not "reasonably necessary." Bureau of Prisons Policy Statement 7400.5D(9)(c)(3) (July 7, 1975). In the alternative, the government asserts that these three staffers, including the charging officer, were adverse witnesses, and therefore under *Baxter v. Palmigiano, supra,* this Court has no authority to second-guess the prison officials.

█ Petitioner has challenged the IDC findings concerning the possible testimony of the three hospital employees by calling attention to the manner in which the IDC arrived at the determination that their testimony was unnecessary. Only the IDC Chairman spoke with the prison employees on the telephone, although the two other members were present during the calls.

They then relied on the chairman's summary of the three statements. Under prison regulations, the necessity of evidence is determined by the IDC Chairman alone. Bureau of Prisons Policy Statement 7400.5D(9)(c)(3) (July 7, 1975). Thus the question is whether the prison regulation is constitutional, i. e., whether a *Wolff* exception to the prisoner's right to call witnesses may be determined by a single member of a disciplinary committee, even though all three members have equal votes in determining guilt and imposing sanctions.

This Court does not see any constitutional impediment to such a procedure. What appears to be a bifurcation of fact-finding and ultimate responsibility is better characterized as the delegation of authority by the committee to a single member. The *Wolff* decision does not address the distribution of responsibilities within the disciplinary committee. If the individual empowered to exclude the requested witnesses had not been a member of the IDC, and thus had not shared in the final decision, the question might have warranted closer examination. However, we must heed the Supreme Court's plea for simplicity as well as rigor in defining due process in a correctional setting. As long as the necessity of evidence is determined by one who shares in the decision of guilt or innocence, this Court finds no constitutional violation.

█ Having determined that the IDC Chairman is validly empowered to decide the necessity of calling witnesses, the question remains whether that authority was properly exercised. The answer is difficult to determine with confidence because the IDC violated its own regulations by failing to document its decision not to summon the three staff members as witnesses. *Id.* Even if the IDC had documented its decision to exclude the witnesses, the record likely would not have supported its action. Under *Wolff,* prison officials may refuse to summon unnecessary witnesses. The IDC decision was based on five sources of information: the incident report, the UDC referral, Lieutenant Brown's investigative report, petitioner Green's testimony before

the IDC, and the telephone calls. The UDC merely found that the IDC was the proper forum. That decision was a measure more of the seriousness of the allegations than of their accuracy. Lieutenant Brown's report was inadequate, as discussed earlier in part II. Therefore the only substantive sources of information were the incident report, Mr. Green's testimony, and the telephone conversations. If the telephone calls were unnecessary, then the IDC decision must have been based on the incident report and the petitioner's testimony. It is doubtful, however, that these two sources alone constituted a sufficient basis for the committee's finding. Indeed, the fact that IDC Chairman Moore made the telephone calls suggests that further testimony was needed. More importantly, one of the other IDC members explained during litigation that the telephone calls reinforced the incident report, and served as a basis for the committee's final decision. By excluding the staff testimony as unnecessary, Chairman Moore mistook corroboration for mere redundance. If it appears that a potential witness may offer testimony that will influence the decision of the prison disciplinary committee, that testimony is necessary under *Wolff*, and the witness should be called. Chairman Moore's decision to exclude the testimony of the three staff members thus was not justified by lack of necessity.[4]

 This Court now turns to the alternative justification for the exclusion of witnesses: institutional security. The government does not specify the hazards involved in allowing the petitioner to call the three employees as witnesses. Rather, the government asserts that these potential witnesses were adverse, therefore the petitioner was actually requesting confrontation and cross-examination, and that under *Wolff* the denial of such a request, usually for security reasons, is immune from judicial scrutiny. It is settled law in this Circuit that an inmate has the right to confront and cross-examine adverse witnesses only if the fact-finder cannot otherwise rationally determine the facts. *Cardaropoli v. Norton*, 523 F.2d 990, 998 (2d Cir. 1975); *Catalano v. United States*, 383 F.Supp. 346, 353 (D.Conn.1974). In the present case, relevant witnesses were available to answer the committee's questions, therefore confrontation and cross-examination were not required.

 The respondents' argument assumes that the right to confront and cross-examine is co-extensive with the right to call witnesses on one's behalf; if there is no right to confront and cross-examine, there is no right to request that the witness be called. This assumption is faulty. The inmate's right to request witnesses in prison disciplinary proceedings includes not merely an opportunity for the inmate or his representative to ask questions of the witnesses, but also the obligation on the part of the disciplinary committee affirmatively to investigate the witnesses' testimony. Prison regulations require that the members of the IDC question requested witnesses, in the absence of a staff representative. Bureau of Prisons Policy Statement 7400.5D(9)(c)(3) (July 7, 1975). The disciplinary committee may also call witnesses in the inmate's absence. *Derosier v. Wilkinson*, Civ. No. B–77–206 (D.Conn. July 6, 1977); *Finney v. Hutto*, 410 F.Supp. 251, 273–74 (E.D.Ark. 1976). The dangers inherent in confrontation and cross-examination therefore do not relieve the committee of its responsibility to consider the testimony of a necessary witness. The failure to summon any of the three employees before the IDC was unjustified, and the petitioner's right to present evidence unconstitutionally impaired.

## B. The Disciplinary Committee Record

 The Supreme Court in *Wolff v. McDonnell, supra*, held that due process required a "written statement of factfinders

---

4. Chairman Moore acted properly in declining to call Mr. Brooks, the second requested inmate witness. According to the testimony of Mr. Gadbaw, an IDC member, Chairman Moore first attempted to determine whether the testimony of Mr. Brooks would be helpful to the proceeding. The decision not to contact Mr. Brooks was made only after the petitioner had failed to show the relevance of Mr. Brooks' probable testimony.

as to the evidence relied upon and the reasons for the disciplinary action taken." 418 U.S. at 563, 94 S.Ct. at 2978. The purpose of such a record is to protect the inmate from erroneous reactions to the disciplinary committee's decision by various correctional bodies, e. g., the parole authorities, and to provide some basis for oversight by other officials, e. g., administrative appeals officers, and the courts. *Cf. United States ex rel. Johnson v. Chairman, New York State Board of Parole*, 500 F.2d 925 (2d Cir.) *vacated as moot sub nom. Regan v. Johnson*, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974). Pursuant to this constitutional mandate, prison regulations now require the IDC to include in the record of its decision the "specific evidence relied on by the Committee, and a brief statement of the reasons for the sanctions," both to be set out in "specific terms" unless doing so would endanger institutional security. Bureau of Prisons Policy Statement 7400.-5D(9)(c)(4) (July 7, 1975). The IDC report does not refer to the evidence upon which the committee relied. Ironically, the only evidence referred to in the report is the petitioner's denial of wrongdoing. Furthermore, the entire text of the reasons for the action taken consisted of three words: "seriousness of offense." This clearly fails the specificity requirement. *Cf. Candarini v. Attorney General of the United States*, 369 F.Supp. 1132, 1137 (E.D.N.Y.1974) (pro forma reasons for denial of parole unconstitutional); *Craft v. Attorney General of the United States*, 379 F.Supp. 538, 540 (M.D. Pa.1974) (same).

■ The IDC record includes two other regulatory inadequacies. First, the IDC was required to document the decision not to call witnesses, but the record fails to mention telephone calls to hospital personnel. Bureau of Prisons Policy Statement 7400.5D(9)(c)(3) (July 7, 1975). Second, prison regulations require the IDC to document any decision to exclude an inmate from a hearing. 7400.5D(9)(c)(5). However, the IDC report fails to advert to the exclusion of Mr. Green during the phone calls to the prison hospital. In sum, the IDC record is insufficient, and its many inadequacies constitute a denial of due process.

## V. THE PAROLE "RESCISSION HEARING"

The next question before this Court concerns the constitutionality of the U. S. Parole Commission rescission hearing on October 17, 1977, at the conclusion of which the Commission rescinded the petitioner's parole and ordered him to remain in prison until the expiration of his sentence in late 1978. In *Williams v. United States Board of Parole*, 383 F.Supp. 402 (D.Conn.1974), the district court ruled that the due process guarantees mandated by *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), were applicable to parole rescission hearings. These due process rights include the calling of witnesses in the inmate's behalf, the confrontation and cross-examination of adverse witnesses, and the effective assistance of counsel. The Parole Board in *Williams* had instead utilized the informal procedures governing initial parole hearings when holding a parole rescission hearing. The *Williams* court found the procedure violate of due process in all three aspects. The district court reiterated its finding that such procedures were illegal in *Metz v. Norton*, Civ. No. B-74-89 (D.Conn. April 30, 1976), a case involving three petitioners whose parole rescission hearings followed the same procedural pattern held unconstitutional in *Williams*. *Accord, McCall v. Norton*, Civ. No. B-74-393 (D.Conn. May 4, 1976); *Bryant v. Norton*, Civ. No. B-74-438 (D.Conn. May 3, 1976).

■ Once again, the U. S. Parole Commission has violated a parole grantee's constitutional rights by conducting a parole rescission hearing without the requisite procedural protections. Petitioner Green was not allowed to call his own witnesses, nor to confront or cross-examine adverse witnesses. In addition, Parole Commission regulations merely provide that "the prisoner may be represented by a person of his choice and

may present documentary evidence." 28 C.F.R. § 2.34(a)(1), 42 Fed.Reg. 39817 (Aug. 5, 1977). Counsel explained to the presiding officer that the procedures constitutionally required for parole revocation hearings applied as well to rescission hearings, but the officer remained unconvinced. "Your role here is not as an attorney," she maintained. "Your role here is as a representative. . . As a representative, you just sit there throughout the whole hearing. At the end of the hearing we ask you to speak on his behalf. You'll get about five minutes." See 28 C.F.R. § 2.13, 42 Fed.Reg. 39811 (Aug. 5, 1977). Later she informed Mr. Green's counsel that "[y]ou may be a full attorney, but this is not a court of law. You're not here like in a revocation hearing or the other type. A rescission hearing is like any other hearing, like an initial, and like a review, hearing."

The final unconstitutional act by the Parole Commission was its failure to scrutinize the IDC finding as to the petitioner's guilt. Parole regulations allow the Parole Commission to treat the IDC decision as "conclusive evidence of institutional misconduct." 28 C.F.R. § 2.34(a)(2), 42 Fed. Reg. 39817 (Aug. 5, 1977). Under *Metz v. Norton, supra* at 13, however, the Parole Commission may do so only if the IDC proceedings themselves meet the rigorous due process standards of *Williams.* And it should be clear by now that the disciplinary committee meeting involving Petitioner Green was sorely lacking in even the minimal protections mandated by *Wolff v. McDonnell, supra.* Nevertheless, the Parole Commission hearing officers treated the IDC decision as non-reviewable, and therefore managed again to deprive the petitioner of his rights to due process.

## VI. THE PROPER REMEDY

This Court must now address the question of the appropriate remedy. Petitioner requests 1) expungement of the record of these proceedings, 2) restoration of his statutory good-time, and 3) immediate release from confinement. Having found numerous violations of petitioner's Fifth Amendment rights, this Court orders expungement of the record before both the Bureau of Prisons and the U. S. Parole Commission, and the restoration of the defendant's thirty days of statutory good-time. A release from confinement, however, is an extraordinary remedy that deserves further discussion.

Respondents argue that this Court is without authority to order the petitioner's release, citing *Billiteri v. United States Board of Parole,* 541 F.2d 938 (2d Cir. 1976). In that case, the district court had ordered the United States Parole Board to release an inmate on parole. The Court of Appeals reversed the lower court's decision, holding that when the Parole Board has exercised its discretion and denied an inmate's right to due process, "[t]he only remedy which the court can give is to order the Board to correct the abuses or wrongful conduct within a fixed period of time, after which, in the case of non-compliance, the court can grant the writ of habeas corpus and order the prisoner discharged from custody." *Id.* at 944.

This Court does not consider the *Billiteri* decision conclusive here. The granting of parole in that case was a decision arrived at by the district court alone. The Parole Board earlier had denied parole, therefore the petitioner had never achieved the status of a parole grantee. In this case, by invalidating the rescission of the petitioner's parole and ordering that the petitioner be released, this Court would not be substituting its own judgment for that of the Parole Commission, but rather would be requiring the Commission to conform to its earlier decision to release the petitioner on September 7, 1977. An order that the U. S. Parole Commission release the petitioner under the conditions established by the National Appeals Board, including Mr. Green's participation in a drug dependency program, is thus within this Court's authority. *See Jackson v. Wise,* 390 F.Supp. 19, 23 (C.D.Cal.1974).

The actions of the United States Parole Commission mandate the petitioner's release. This case constitutes the sixth

known violation of an inmate's Fifth Amendment rights in this district since *Williams v. U. S. Board of Parole, supra.* Yet the Parole Commission regulations remain unchanged, and the unconstitutional practices continue. The Commission's illegal conduct in this case was not a failure to anticipate evolving constitutional doctrine, but rather a gross disregard for the constitutional rights of a federal prisoner, as well as a blatant refusal to be bound by the rulings of this federal district court. This institutional recalcitrance indicates that firm measures are required to ensure that the Commission act constitutionally. The administrative burden accompanying expungement and rehearing will likely be an insufficient deterrent to future deprivations of inmates' Fifth Amendment rights by the Parole Commission. Furthermore, the petitioner has already remained in prison for more than two months beyond his original release date. This Court will not permit him to be imprisoned further on the mere possibility that correctional authorities may choose to act within the law and, when doing so, may determine that the petitioner did indeed violate prison regulations.

On the basis of the foregoing reasons, it is hereby ORDERED:

1) that the record of all proceedings before the Bureau of Prisons and the U. S. Parole Commission arising from the incident of August 8, 1977 be expunged;

2) that the petitioner's thirty days of statutory good-time be restored; and

3) that the petitioner be released on parole forthwith under the conditions established by the National Appeals Board of the U. S. Parole Commission in connection with the original release date of September 7, 1977.