Robert **FINNEY** et al., Petitioners,

v.

James **MABRY** et al., Respondents.

No. PB–69–C–24.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

June 30, 1978.

---

Philip E. Kaplan, Jack Holt, Jr., Phillip H. McMath, Little Rock, Ark., for petitioners.

Robert M. Lyford and James E. Smedley, Asst. Attys. Gen., Little Rock, Ark., for respondents.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This case, a class action suit on behalf of all inmates confined in the Arkansas Department of Correction, concerns the constitutionality of the practices and procedures at the several units of the Arkansas Department of Correction (ADC) and is now in its tenth year of litigation. Hearings were held in January, 1978, in a bifurcated procedure: due to a fear of recrimination by prison officials against prisoners who instigated and/or participated in litigation, the prisoners' court-appointed attorneys were concerned that usual civil procedures would not afford them a realistic opportunity to present their claims, and their witnesses, without interference. The hearings were therefore allowed to proceed with a minimum of discovery by defendants and without the identification in advance by plaintiffs of their witnesses. Defendants were allowed to cross-examine witnesses at their initial appearances and to preserve the right to further cross-examine them on recall during the presentation of their own case, which was to occur after an appropriate interval.

During the presentation of the plaintiffs' case, which covered the entire gamut of prison-related complaints, certain evidence concerning the conduct of prison disciplinary procedures was presented. The Court understood at one point that at least this aspect of the case could be decided without the presentation by defendants of further evidence because of apparent factual concessions by defendants. This interpretation was disputed by defendants, however, and they, therefore, were given an opportunity to present evidence on such procedures. That evidence was in fact presented on April 18–19 and May 26, 1978. This opinion deals only with the constitutionality of the disciplinary procedures at the Cummins Unit of the Arkansas Department of Correction, but the conclusions are of course applicable to all units of the Department.

This case may best be approached through an examination of that part of the history of the case which relates to disciplinary procedures; the basic facts showing the Cummins Unit disciplinary procedures as they have operated in the recent past; and the guidelines established in this particular area by recent United States Supreme Court, and other federal court, cases.

In 1973 Judge Henley first explicitly examined the disciplinary procedures utilized by the ADC with respect to inmates who violate prison rules. In a brief review of the basic procedure then in use, Judge Henley applied the then rapidly developing law without an extended analysis. He noted that, "it is clear that . . . an inmate is not entitled to a full fledged judicial trial

or to all of the guarantees and protections afforded by the Fourteenth Amendment to a person charged in court with a criminal offense. On the other hand, he is entitled to be advised of the charge against him, and to be heard, and to have his case considered seriously, dispassionately, and objectively, although he naturally cannot expect an 'impartial' fact finding body in the sense that a criminal defendant is entitled to an 'impartial' jury." *Holt v. Hutto*, 363 F.Supp. 194, 207 (E.D.Ark.1973). Judge Henley went on to find that the disciplinary procedures were administered by the ADC summarily and with hostility, and required (1) that, except in unusual cases, an accused inmate must be given a hearing within 72 hours after the occurrence of the disciplinary episode; (2) that hearings were to be conducted insofar as possible between the hours of 6:00 a.m. and 6:00 p.m.; and (3) that all hearings were to be reported in such a manner that, if the occasion arose, a reviewing authority, including a court, could determine exactly how much time was taken at the hearing and essentially what was said and done by the individuals involved, with the caution that the tapes or transcripts were to be preserved for at least "a reasonable time" after the hearing. 363 F.Supp. at 207–08.

The Eighth Circuit Court of Appeals affirmed Judge Henley's ruling, but added more specific guidelines in view of the then-resent Supreme Court case, *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Therefore, the procedures constituting the minimum assurance of due process were stated as: "(A) written notice of charges at least 24 hours prior to the hearing; (B) a qualified right to call witnesses; and (C) a written statement by the committee of the factual basis for its decision." *Finney v. Arkansas Board of Correction*, 505 F.2d 194, 208 (8th Cir. 1974). In addition, that Court directed the district court to bar the charging officer from sitting in judgment on his own complaint in disciplinary proceedings. 505 F.2d at 208.

Judge Henley next addressed the problem of disciplinary hearings in 1976, holding that the ADC's rules and regulations, promulgated in the wake of *Wolff*, relating to disciplinary matters, which rules appeared in the 1975 (and still currently used) Inmate Handbook, were constitutional. Judge Henley outlined the basic procedure, as provided in those rules:

"Turning now to major disciplinary procedures, an inmate facing a major disciplinary charge is required to be served with a written copy of the charge not less than twenty-four hours before the disciplinary hearing that must be held within seventy-two hours after the occurrence of the disciplinary episode, except that in unusual circumstances the Superintendent of the institution may grant limited extensions of time.

"The inmate is entitled to appear before the committee, including a panel thereof, and is entitled to present his version of the incident. He may also 'call witnesses' in the sense that he may identify potential witnesses to the officer who notifies him of the charge against him. The committee is authorized to call all necessary witnesses. The testimony of a witness may be taken in writing before the hearing or orally before the committee in the course of the hearing.

"If in the course of a hearing the panel calls witnesses, the accused is not permitted to be present while the witnesses are testifying; on the other hand, the charging officer is not permitted to be present during the testimony of witnesses. Commissioner Hutto explained this procedure by saying that in view of the conditions of prison life an inmate witness is simply not going to say anything adverse to the accused and is not likely to say anything that may bring him into the bad graces of the charging officer. Consequently, the testimony of inmate witnesses if taken in the presence of either the accused or the charging officer would probably be essentially worthless. The accused is not permitted to cross-examine the employee who prepared the initial disciplinary report and who is frequently the charging officer; in Mr. Hutto's view such cross-examination would be worthless and

would be quite likely to cause increased hostility between the inmate and the employee involved and might lead to future confrontations between them. In the court's opinion, Mr. Hutto's views are reasonable, and the court does not consider that the practices just described offend *Wolff v. McDonnell* or that they violate due process of law.

"At the conclusion of the hearing, the panel decides the case, and if the accused is found guilty, punishment is assessed. The court presumes that the decision and action of the panel in a given case is determined by the vote of a majority of the members of the panel. If the accused is found guilty, the panel is required to state in writing the reasons for its decision.

"An inmate may appeal an adverse disciplinary ruling to the Superintendent of the institution by filing a written notice of appeal within three days after the adverse decision is rendered. However, the Superintendent is not required to review the decision unless he considers that the facts of the case warrant review. If the Superintendent's ruling is adverse to the inmate, the latter may appeal to the Commissioner and finally to the Board of Correction itself. However, the rules provide that if in connection with any appeal an inmate wilfully and knowingly makes a false statement or deliberately tries to deceive the reviewing authority, the inmate's action is in itself a major disciplinary violation."

*Finney v. Hutto*, 410 F.Supp. 251, 273–74 (E.D.1976)

If this procedural model were representative of the manner in which the system operated in fact, then the Court would have little problem in deciding that it met constitutional due process standards. But there are further unaddressed aspects of the process that have come to light in this Court's hearings, and disturbing interpretations and applications of Judge Henley's opinion by the prison officials, which require a new examination of the hearing process.

The current Inmate Handbook issued by the ADC (fourth revised edition, January, 1975), contains a section outlining the disciplinary process as follows:

"DISCIPLINARY COMMITTEE HEARINGS

"A. Each unit of the Department shall establish and designate a Disciplinary Committee to hear and dispose of any and all infractions of the institutional rules and regulations.

"B. The Superintendent of each unit shall designate the members of the Disciplinary Committee, and may alternate the two members from the security and treatment staff among staff personnel from time to time as he deems appropriate.

"C. The Disciplinary Committee shall meet as often as necessary at a place and time convenient to administer the institutional disciplinary functions within seventy-two (72) hours after the occurrence of the disciplinary episode, except that in exceptional instances the Superintendent may grant limited extensions of time. The seventy-two (72) hours will be deemed to be exclusive of Saturdays, Sundays, and official state holidays. The inmate will be given a written copy of charges against him at least 24 hours prior to the disciplinary hearing and the inmate may call witnesses by giving their names to the notifying officer at that time.

"D. Upon convening to consider cases of inmate violations of rules and regulations, the Disciplinary Committee will cause the inmate charged to appear before it and he will be afforded an opportunity to present his version of the alleged violation.

"E. The Disciplinary Committee may summon any and all additional witnesses that may be necessary in carrying out its function. Witnesses' statements may be taken in writing prior to the hearing or they may be oral. The choice of how the statements will be taken is left to

the discretion of the Disciplinary Committee Chairman.

"F. Upon hearing the charge against the inmate, the inmate's defense and the testimony of other witnesses, the Disciplinary Committee shall render its decision as to guilt or innocence and shall determine the appropriate disciplinary action to be taken. Upon returning a guilty verdict, the Disciplinary Committee Chairman must put in writing the reason for returning that verdict.

"G. Any inmate has the right to appeal any decision of any disciplinary action taken by the Disciplinary Committee directly to the Superintendent of the Unit involved. Appeals shall be submitted in writing within three days after the filing of the Disciplinary Committee Report and the Superintendent shall review the case only if, in his opinion, sufficient cause is shown for such a review. Upon review, the Superintendent may affirm the action of the Disciplinary Committee or alter it as he deems just and proper except at no point in the appeal process shall the penalty be increased.

"H. Any inmate has the right to appeal the decision to the Superintendent or to the Commissioner of the Department of Correction, after he has appealed to the Superintendent. Such appeal shall be submitted in writing within three days after the decision of the Disciplinary Committee and shall set forth in detail the grounds for appeal. Upon review, the Commissioners may affirm the action of the Disciplinary Committee, or alter it as he deems just and proper. If an inmate is dissatisfied upon appealing the disciplinary first to the Superintendent and then to the Commissioner, he may appeal the disciplinary action directly to the Board of Correction.

"I. Any inmate who files an appeal to the Superintendent, the Commissioner, or the Board of Correction in which appeal he alleges facts which are not true, knowing that the statements are deliberately intended to mislead the Superintendent, the Commissioner, or the Board of Correction, shall be deemed guilty of a major infraction of institutional rules and regulations and shall be dealt with accordingly.

"J. The Disciplinary Committee, upon finding that an inmate is guilty of a violation of institutional rules and regulations, may take any or all of the following actions:

"1. Warn, reprimand and excuse the inmate.

"2. Sentence the inmate to isolation for indefinite period of time.

"3. Deprive the inmate of any privileges, including but not limited to movies, outside activities, special entertainment, commissary privileges, etc., for a designated period of time.

"4. Require an inmate to perform additional work assignments for a period of time.

"5. Recommend set-up of parole interview dates for not less than three (3) nor more than six (6) months.

"6. Recommend loss of Statutory Good Time or Meritorious Good time.

"7. Recommend denial of Meritorious Good Time for a period of time not in excess of the provisions of Chapter II of the Rules and Regulations of the Board of Correction.

"8. Reduce the inmate's institutional status, i. e., a reduction in class. Impose disciplinary action and suspend such action for a period of time.

"K. No disciplinary action shall be taken against any inmate which action shall have the effect of depriving the inmate of sufficient nutritional diet or adequate rest or clothing and no such action shall cause physical injury to the inmate. Corporal punishment shall not be imposed under any circumstances.

"L. No disciplinary action shall be taken against any inmate by any person except pursuant to the procedures herein outlined, PROVIDED, that the Shift Supervisor or higher ranking personnel may place the inmate on administrative segregation or barracks arrest pending Disciplinary Committee action.

"M. If the Chairman of the Disciplinary Committee determines that the inmate is illiterate or is otherwise unable to properly present his case, the Chairman may appoint a member of the staff to assist the inmate in his presentation. The Superintendent will provide the Chairman of the Disciplinary Committee with a list of staff members who do not regularly sit on the Disciplinary Committee that are available for this duty."

This policy statement reflects the substance of an ADC policy memorandum issued on August 27, 1974, designed to meet the standards of *Wolff*. After Judge Henley's March, 1976, opinion in this case, *see supra,* the ADC issued a new policy memorandum on April 26, 1976, as follows:

"A. Each unit of the department shall establish and designate a disciplinary committee to hear and dispose of any and all infractions of institutional rules and regulations.

"B. The Disciplinary Committee at each unit shall be composed of at least the following department personnel:

Associate Superintend-
 ent or his designee .. Chairman
Chief Security
 Officer .......... Non-voting member
One (1) Security ..... Member
One (1) Treatment ... Member

"C. Any three (3) members of the Disciplinary Committee shall constitute a quorum and may function on behalf of the committee.

"D. The Superintendent of each unit shall designate the members of the Disciplinary Committee and may alternate the two (2) members (security and treatment) from time to time among staff personnel

as he may deem appropriate except that in no case shall the charging officer sit as a member of the committee. The charging officer shall be excluded from all proceedings of the Disciplinary Committee except during the time of his testimony if requested by the Committee. Neither shall the charging officer be allowed supervision, during the time of the hearing, over inmates appearing before the Disciplinary Committee.

"E. Prior to the Disciplinary Committee meeting, the Chief Security Officer will review all disciplinaries at that time and may do one of the following: (1) forward disciplinary to Disciplinary Committee with initial on report. (2) revert to minor Disciplinary Committee. (3) dismiss charges and file disciplinary report as matter of record; in these decisions the chief Security Officer must consult with the charging officer prior to the choices.

"F. The Disciplinary Committee shall meet as often as necessary at a place and time convenient between the hours of 6:00 a. m. and 6:00 p. m., in order to administer the institutional disciplinary functions as expeditiously as possible. In no case shall the committees fail to meet at least one (1) day each week. The inmate will be given a written copy of charges against him at least twenty-four (24) hours prior to the disciplinary hearing. The inmate may call witnesses at this time by giving the notifying officer the names of witnesses at the time the written notice is served. The Chief Security Officer may set reasonable limitations on the number of inmate witnesses called. In the event an inmate is charged with refusal or failure to work in the form of malingering (feigning illness or injury to avoid work) the disciplinary committee sitting on the inmate's case shall first consult with the doctor or other medical personnel who examined the inmate and shall have determined that the examiner or examiners of the accused inmate was or were of the opinion that the inmate was malingering (feigning illness or injury to avoid work) on the occa-

sion in question. The committee may receive written or oral testimony from the examiner or examiners but in either case it must be read into the taped record of the disciplinary hearing.

"G. Upon convening to consider cases in inmate violations of the rules and regulations, the Disciplinary Committee shall cause the inmate to present his version of the alleged violation. The committee is expected to convene for a hearing within 72 hours after the occurrence of the disciplinary episode. In exceptional cases, limited extensions of time may be granted by the respective superintendents, i. e., escaped inmates not in custody, inmates out to court, awaiting decision of prosecuting attorney reference filing of felony charge, when the case requires more extensive investigation, or the occurrence has been concealed. The committee may, with the permission of the Superintendent, recess the hearing for a short period of time if it needs additional information or investigation in order to arrive at a fair decision. Seventy-two (72) hours will be deemed to be exclusive of Saturdays, Sundays, and official state holidays.

"H. The Disciplinary Committee may summon any and all additional witnesses that it may deem necessary in carrying out its functions. Witnesses' statements may be either in writing taken prior to the disciplinary hearing or oral. If the witness's statement is oral, it must be taped. The choice of how the witness's statement is taken will be left to the discretion of the Disciplinary Committee chairman. If the witness's statement is in written form, the statement must be read into the tape by the Disciplinary Committee Chairman.

"I. Upon hearing the charge against the inmate, the inmate's defense and the testimony of any other witnesses, the Disciplinary Committee shall render its decision as to guilty or innocent and shall determine the appropriate disciplinary action to be taken. Upon returning a guilty verdict, the Disciplinary Committee Chairman must put in writing the reason for returning the guilty verdict.

"J. When the Disciplinary Committee has completed its work for the day, the Chairman shall complete and sign the *Disciplinary Committee Report* form provided and transmit it immediately to the Superintendent for approval. Upon giving his approval, the Superintendent shall forward such form to the Commissioner of the Department of Correction for approval and review. All disciplinary hearings shall be taped in their entirety and the tapes shall be preserved for a period not less than six months. In addition, the Superintendent may, if deemed desirable, cause transcripts of the hearing to be made.

"K. Once the Disciplinary Committee report has been signed by the Committee Chairman and approved by the Superintendent, the disciplinary actions shall not be altered in any way, except as hereinafter provided.

"L. Any inmate has the right to appeal any decision of, or disciplinary action taken by, the Disciplinary Committee, directly to the Superintendent of the unit involved. The appeal shall be submitted in writing within three (3) days after the filing of the Disciplinary Committee report and shall set forth in detail the grounds for such appeal. In the event the inmate is illiterate, the Chairman of the Disciplinary Committee shall appoint at the request of the inmate a staff member to assist him in writing his appeal letter. Upon receipt of such written appeal, the Superintendent shall review the case only if, in his opinion, sufficient cause is shown for such a review. Upon review, the Superintendent may affirm the action of the Disciplinary Committee or alter it as he deems just and proper except at no point in the appeal process shall the penalty be increased. If an inmate is dissatisfied with his appeal to the Superintendent, he may continue his appeal and direct it to the Commissioner of the Department of Correction. The appeal shall be submitted in writing within three days after the decision of the Superintendent and shall set forth in de-

tail the grounds for such appeal. If an inmate is dissatisfied upon appealing the disciplinary first to the Superintendent and then the Commissioner, he may appeal the disciplinary action directly to the Board of Correction. This will be the final administrative step in appealing the disciplinary. If the Superintendent is in any way involved as the charging officer he shall disqualify himself as the appeals officer and automatically pass the appeal to the Commissioner.

"M. Any inmate who files an appeal to the Superintendent or to the Commissioner in which appeal he alleges facts which are not ture [sic], knowing that the statements are not true, or in which he fails to state the full true facts, deliberately intending to mislead the Superintendent or the Commissioner, shall be deemed guilty of a major infraction of institutional rules and regulations and shall be dealt with accordingly.

"N. The Disciplinary Committee, upon determining that an inmate is guilty of a violation of institutional rules and regulations, may take any or all of the following actions:

"(1) Warn, reprimand and excuse the inmate.

"(2) Sentence the inmate to isolation for an indefinite period of time.[1]

"(3) Deprive the inmate of any privileges, including but not limited to movies, outside activities, special entertainment, commissary privileges, etc., for a designated period of time.

"(4) Require the inmate to perform additional work assignments for a period of time.

"(5) Recommend set-up of parole interview dates for not less than three (3) nor more than six (6) months.

"(6) Recommend loss of Statutory Good Time or Meritorious Good Time.

"(7) Recommend denial of Meritorious Good Time for a period of time not in excess of the provisions of Chapter II of the Rules and Regulations of the Board of Correction.

"(8) Reduce the inmate's institutional status, i. e., a reduction in class.

"(9) Impose disciplinary action and suspend such action for a period of time.

"O. All Disciplinary Committee Report forms which have been approved by the Superintendent and the Commissioner shall be transmitted by the Commissioner to the Supervisor of Records who will promptly note the action taken against each inmate. The Supervisor of Records shall there-upon make whatever changes are required regarding Statutory Good Time, Meritorious Good Time, parole interview date and institutional status and cause them to be made a part of the inmate's permanent file.

"P. No disciplinary action shall be taken against any inmate which action shall have the effect of depriving the inmate of sufficient nutritional diet or adequate rest or clothing and no such action shall cause physical injury to the inmate. Corporal punishment shall not be imposed under any circumstances.

"Q. Disciplinary action should be taken by the Disciplinary Committee as soon as possible after the discovery of the violation.

"R. No disciplinary action shall be taken against any inmate by any person except pursuant to the procedures herein outlined, PROVIDED, that the Shift Supervisor or higher ranking personnel may place the inmate on administrative segregation or barracks arrest pending Disciplinary Committee action.

"S. If the Chairman of the Disciplinary Committee determines that the inmate is illiterate or is otherwise unable to properly present his case, the Chairman may appoint a member of the staff to assist the inmate in his presentation. The Superintendent will provide the Chairman of the Disciplinary Committee

---

1. This practice was enjoined by Judge Henley, the maximum period of punitive isolation being set at 30 days. *See* 410 F.Supp. at 272–78. Judge Henley's order was affirmed by the Eighth Circuit, *see* 548 F.2d at 741, and by the United States Supreme Court, *see Hutto v. Finney,* —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

with a list of staff members who do not regularly sit on the Disciplinary Committee that are available for this duty.

"T. Questions concerning the applicability or purport of these rules and regulations shall be directed to the Commissioner for his decision, which decision will be final.

"U. These rules and regulations shall become effective August 24, 1974, amended April 16, 1976."

The testimony and evidence in this case have shown, however, that the actual operation of the disciplinary process has not conformed in significant respects to the procedures described in the above rules and regulations nor to the minimum standards mandated by constitutional due process.

*Overview of the Basic Procedure*

According to the testimony of the currently acting Assistant Warden for custody at the Cummins Unit (who formerly was the unit's administrative review officer and who has worked in various ranks as a correctional officer), when an officer personally witnesses a disciplinary rule violation, he takes the inmate to his building supervisor for a report, at which time the supervisor should "investigate" the facts, interview the inmate, and decide whether to send the matter to the disciplinary committee. If the information of an infraction is received from another source by an officer, he interviews the inmate victim or source, attempts to locate and interview any other witnesses, and turns all of the information over to his building supervisor, who then might investigate further and who, in any event, decides whether to file a formal charge with the disciplinary committee. At times the information is taken to a supervisor by an officer in verbal form, and is later reduced to writing. If a disciplinary charge is to be made, the officer might be advised to write the charge, perhaps with help from the supervisor, and the officer might be required by the supervisor to perform additional investigation of the matter pursuant

to the filing of the charge. The disciplinary charge is usually handwritten and witness statements supposedly are attached, which statements may be gathered by any officer and may eventually include statements of witnesses listed by the inmate in response to the charge, although not even the names of any inmate witness appear on the disciplinary charge itself. The disciplinary charge is put in typewritten form in the "inmate countroom" where several inmate clerks process these items. The Building Major then reviews the disciplinary and may dismiss it or reduce the charge on his own sole authority, or he initials it and sends it on to the disciplinary committee.

According to this witness's testimony, the disciplinary process is initiated at any given time by the Building Major, who has in hand the pending charges. The Major calls upon the associate superintendent for custody or for treatment, and the associate superintendent then makes up the three member committee by choosing available, eligible officers from a list.[2] The chief security officer, rather than the chairman of the committee, sets the limit on the number of inmate witnesses called. The charging officer's statement is also supposed to be written on a separate blank sheet in the form of an "incident report" for presentation to the committee. Frequently, however, if not usually, the disciplinary procedure goes forward with no witnesses' statements, and no such report, being presented during the adjudication "hearing." During the hearing the chairman may occasionally conduct an on-the-spot investigation by telephoning an officer to ascertain some pertinent fact.

The testimony of the current Building Major for Security, who is also the Chief Security Officer, generally confirms this process, with some variations. This witness testified that the warden of the unit makes up the disciplinary committee on any given occasion; that he, as the Chief Security Officer, serves as the "clerk" at the hearings; that he limits the number of witness-

---

**2.** Plaintiffs' claim that the ADC practices racial discrimination in the composition of the disciplinary committees will be considered in a later opinion in conjunction with other claims of institutional racial discrimination.

es that can be called by a charged inmate; that he is rarely asked by the committee to conduct any further investigation on a charge; and that he is sometimes asked about the case by members of the committee and then will give his opinion. The committee conducts the meetings in a room in the maximum security building.

Finally, the current assistant to the warden, who formerly sat as a member and chairman of the disciplinary committee on many occasions, testified that an accused inmate is advised at the outset of the hearing as to the nature of the proceedings, the identity of the members of the committee, and what the charges are. He is then asked what his plea is. The inmate may make a statement, if he wishes. He then leaves the room. The witnesses' statements, if any, are read; the committee decides on guilt or innocence; and, if "guilty," determines the punishment; and the inmate is then brought back into the room, informed of the verdict and informed of the appeal process if the verdict was guilty.

*Significant Problems With Disciplinary Procedures*

Testimony and evidence in this case have shown that adjudications of disciplinary violation charges frequently are based solely on the statements of a "charging officer" or "investigating officer" who presents to the committee only summary conclusions "learned" from *other* sources, be they witnessing officers or named inmate witnesses. In these cases, no witness's statements, oral or in writing, are presented to the committee. The committee simply relies on the officer's statement of what he has learned from others. The Court is convinced, from all the testimony, that this procedure invites, and has in fact permitted, correctional officers to obtain disciplinary sanctions against inmates on unsubstantiated and, indeed, fabricated charges.

Even more ominous, the evidence in this case shows that it is not rare for a disciplinary charge to be adjudicated *solely* on the basis of an investigating officer's statement of what some unnamed informant, identi-

fied as such, told him. While it would not be an unusual or unreasonable rule that a prisoner charged with a disciplinary rule infraction not be advised of an informant's identity, here we have prosecutions of prisoners on the basis of informant information where the committee itself has before it neither the identity of the informer nor any direct statement of the informer. The Court is convinced from all the testimony that this situation invites, and has in fact permitted, correctional officers and inmates to obtain disciplinary sanctions against inmates on the basis of fabricated charges.

Testimony in this case also has shown that it is the practice of the committee, incredibly enough, *not* to have physically before it any tangible or physical evidence that may be involved in any alleged disciplinary violation, even when such evidence may be extremely important, if not crucial.

The evidence also shows that the committee, on occasion, summarily disregards the defense contentions of the inmate, with no investigation of any kind either by officers before the proceeding or by members of the committee during the hearing process.

The ADC uses a pre-printed form in each disciplinary case entitled "Statement of Evidence Relied Upon for Disposition and Reasons for Disciplinary Sanction Imposed." This type of explanation was required by the *Wolff* case, *see infra.* In the great majority of the cases, this form is filled out as follows:

"EVIDENCE RELIED UPON FOR DISPOSITION OF DISCIPLINARY:

officer's statement

REASONS FOR ASSESSMENT FOR PUNISHMENT:

nature and seriousness of offense and past history"

To compound the difficulty of this entire situation, the tape recordings of the disciplinary proceedings, the fact of which might be expected to compensate in some respects for the paucity of the written record, are kept only for about six months following the proceeding.

In addition to the above problems which have arisen out of the defendants' rules and their official interpretations of those rules, the testimony and evidence in this case shows that high-ranking officers at the Cummins Unit have, contrary to said rules, on an undetermined number of occasions completely subverted all semblance of due process by directly ordering a member or members of the committee to find particular inmates guilty or not guilty and by directly specifying the punishment to be imposed. When this scenario was revealed during the hearing, an investigation was undertaken by the ADC, the initial results of which are to be found in the appendix. The investigation is continuing at the time of this opinion. The Court is not convinced that this type of subversion of the very essence of due process is a pervasive pattern and practice, but neither is the Court of the opinion that the definitely confirmed instances were isolated incidents.

Confirming the erratic and, to say the least, imperfect work of the committee is the testimony of the former Administrative Review Officer, whose job included processing, investigating, and recommending dispositions of inmates' administrative appeals of their disciplinary convictions. The review of these appealed convictions often was an extensive, *de novo* investigation and readjudication by this officer alone, whose particular zeal and thoroughness was, by his own view, the saving grace of the entire process, since this stage of review was apparently counted on to remedy any and all defects in the original committee adjudications. The Court views the situation somewhat differently and considers this officer's testimony of the extensive investigations needed on review, coupled with an apparently very high rate of reversal,[3] as confirmation of the quite basic inadequacy of the committee procedures as actually conducted.

### The Constitutional Requirements: Wolff v. McDonnell

The parameters of the requirements of constitutional due process in the prison disciplinary hearing setting were established by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The rules announced in that case do not explicitly cover all situations in this area, but the principles stated therein certainly provide a satisfactory framework for the resolution of the legal issues confronting the Court here.

In *Wolff* the Supreme Court noted the propriety under 42 U.S.C. § 1983 of seeking injunctive relief to restrain prospectively the enforcement of invalid prison regulations, since a prisoner in a state institution may claim the denial, without due process, of his right to "liberty" where he is, in prison disciplinary proceedings, being subjected to the loss of state-created "good time" credits. "[T]he State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." 418 U.S. at 557, 94 S.Ct. at 2975.

Although a prisoner is, then, entitled to constitutional due process protections in this context, the main thrust of *Wolff* is its explication of how a "mutual accommodation" necessitates that these constitutional rights be "diminished by the needs and exigencies of the institutional environment." Since the "touchstone of due process is protection of the individual against arbitrary action of government," and "since prisoners . . . can only lose good-time credits if they are guilty of serious misconduct, the

---

**3.** Apparently many, if not most, of the disciplinary convictions result in administrative appeals by the inmates. Of the appealed cases, apparently only a certain number are investigated by the administrative review officer (or by the warden or assistant warden), but of these the testimony indicated that from 50 to 80 percent result in some type of relief, from lessened punishment to dismissal of the charge.

determination of whether such behavior has occurred becomes critical and the minimum requirements of procedural due process appropriate for the circumstances must be observed." 418 U.S. at 558, 94 S.Ct. at 2976.

The Supreme Court made what may only be called a close judgment in balancing the interests of the inmate against the state's interest in the process of determining these minimum requirements:

"For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that. The deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance. But it is qualitatively and quantitatively different from the revocation of parole or probation.

"In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by *Morrissey* for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing. That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses—at least no more so

than in the case of the ordinary criminal trial. Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

"It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonisms on the important aims of the correctional process.

"Indeed, it is pressed upon us that the proceedings to ascertain and sanction misconduct themselves play a major role in furthering the institutional goal of modifying the behavior and value systems of prison inmates sufficiently to permit them to live within the law when they are released. Inevitably there is a great range of personality and character among those who have transgressed the criminal law. Some are more amenable to suggestion and persuasion than others. Some may be incorrigible and would merely disrupt and exploit the disciplinary process for their own ends. With some, rehabilitation may be best achieved by simulating procedures of a free society to the maximum possible extent; but with others, it may be essential that discipline be swift and sure. In any event, it is argued, there would be great unwisdom in encasing the disciplinary procedures in an inflexible constitutional straitjacket that would necessarily call for adversary proceedings typical of the criminal trial, very likely raise the level of confrontation between staff and inmate, and make more difficult the utilization of the disciplinary process as a tool to advance the rehabilitative goals of the institution. This consideration, along with the necessity to maintain an acceptable level of personal security in the institution, must be taken into account as we now examine in more detail the Nebraska procedures that the Court of Appeals found wanting."

418 U.S. at 560–63, 94 S.Ct. at 2977–78.

The Court then established guidelines in five basic areas, necessarily responsive to the particular problems presented in that case involving the Nebraska prisons: (1) advance written notice of charges must be given to the disciplinary action inmate, no less than 24 hours before his appearance before the disciplinary committee; (2) there must be a written statement by the fact-finders as to the evidence relied on and reasons for the disciplinary action; (3) the inmate should be allowed to call witnesses and present documentary evidence in his defense if permitting him to do so will not jeopardize institutional safety or correctional goals; (4) the inmate has no constitutional right to confrontation and cross-examination in prison disciplinary proceedings, such procedures in the current environment (while prison disruption remains a serious concern) being discretionary with the prison officials; and (5) inmates have no right to retained or appointed counsel in such proceedings, although counsel substitutes should be provided in certain cases.

And the Court observed that these requirements were "not graven in stone. As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court." 418 U.S. at 572, 94 S.Ct. at 2982. Further consideration and reflection were not long in coming for in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Supreme Court held, *inter alia*, that the *Wolff* principle of "reasonable accommodation" means that when an inmate at a disciplinary hearing is denied the privilege of confronting and cross-examining witnesses, the decision is within the sound discretion of prison officials and does not have to be justified in writing on grounds that appeal to judges.

*Due Process and the Arkansas Department of Correction*

Petitioners in this case urge that, because the Supreme Court has so circumscribed the due process protections of prisoners in disciplinary procedures, this Court should be especially careful to safeguard zealously those due process requirements that remain. While this concept is not without appeal, the better approach, and the approach to be followed by this Court, is to consider carefully what *Wolff* demands or suggests with respect to the particular issues in this case and then to insure that whatever constitutional rights are found to apply are zealously protected and enforced.

The most difficult problem in this case is presented by virtue of the frequent (and officially sanctioned) reliance by the disci-

plinary committee on secondary "reports" of rule violations, with no primary evidence of guilt of any sort, in the form of witness statements, oral or written, or physical evidence, being brought before the committee. The committee cannot rationally determine guilt in such instances except by a blind acceptance of the "officer's statement," which is exactly what the typical case involves, according to the testimony of a past committee member and chairman. When the charging officer is not a witness to the infraction, such an "adjudication," in view of the realities of the prison environment, necessarily is so fraught with the risk of error that it can only be considered arbitrary. The effect is to simply delegate the decision-making to the investigating officer.

What is the dispassionate and fair inquiry function of such a committee to mean if a correctional officer may present what he has "learned" about an incident and his opinion as to guilt, to be countered only by an inmate's denial? The prospects for abuse and error in blindly accepting and "rubber-stamping" the *opinion* of the reporting officer have indeed been realized according to the evidence in this case. Although no procedure will ensure that retributive or simply erroneous charges are always discovered in the hearing process, the procedure must require the presentation of more definite factual grounds than the unexplained, totally uncorroborated charge and opinion of an officer as a result of what he has learned from others, be they other officers or inmates; in other words, something that could legitimately be called "evidence" must be presented to the hearing committee.

Such a concept 'is not an application of the normal hearsay rule in a court of law, for indeed the principal conditions of witness testimony under that rule in the Anglo-American tradition—oath, personal presence, and cross-examination—have already been abrogated in the prison disciplinary hearing setting. But the need for the hearsay rule in the first place was in large part the product of a gradual evolution of the jury, from which came the concept that "the normal source of proof of fact is not the private knowledge or investigation of the jurors, but the testimony of witnesses." McCormick on Evidence, 579. And the recognition of this basic tenet must be relevant in determining how a rational decision of fact may be reached. One's conception of that minimal quantum of relevant evidence that is necessary to establish a fact may be subject to wide debate, but the notion that a disciplinary committee may adopt, with no corroboration, a non-witness officer's report and opinion concerning allegations of an inmate's serious misconduct surely must be rejected out of hand. Nor does the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application," *Wolff*, 418 U.S. at 556, 94 S.Ct. at 2975, demand such a practice.

In *Wolff*, although this question did not arise, the Court held that confrontation and cross-examination in disciplinary hearings were not constitutionally required, due to the hazards to institutional interests, "and that adequate bases for decision in prison disciplinary cases can be arrived at without cross-examination." 418 U.S. at 568, 94 S.Ct. at 2980. The "adequate bases" that the Supreme Court was relying on can only mean the normal process of consideration by the committee of *evidence*, which this Court holds must at least be in the form of witnesses' statements, written or oral, presented to the committee for its consideration. If the charging officer's statement is in the form of a witness's statement,[4] then it certainly would meet this standard. Further, if physical evidence in the possession of prison officers is involved in, or crucial to, the determination, such as weapons or contraband, then that evidence should be presented to and considered by the committee. If institutional safety unduly complicates this task because of the

---

4. It is instructive that the disciplinary rule conviction in *Baxter* was based on "primary" evidence in that a written report of the *witnessing* officer was before the committee. *See* 425 U.S. at 320 n.4, 96 S.Ct. at 1559 n.4, 487 F.2d 1280, 1282.

present location of the hearings, then the location will have to be changed.[5]

These procedural requirements to ensure adequate evidence should come as no surprise, because past rulings in this very case and the ADC's own regulations mandate the same result. In 1976 Judge Henley, in describing the disciplinary hearing procedures, spoke not of *whether* the committee would receive any witness's testimony, but *how* such testimony would be received:

"The committee is authorized to call all necessary witnesses. The testimony of a witness may be taken in writing before the hearing or orally before the committee in the course of the hearing."

410 F.Supp. at 273.

And in the Inmate Handbook, as recited *supra*, the ADC rule is stated in terms of *how* witnesses' testimony is to be taken, not *whether* any testimony shall be gathered at all:

"E. The Disciplinary Committee may summon any and all additional witnesses that may be necessary in carrying out its function. Witnesses' statements may be taken in writing prior to the hearing or they may be oral. The choice of how the statements will be taken is left to the discretion of the Disciplinary Committee Chairman."

Inmate Handbook at 27.

And in the ADC revised rules of 1976 it is stated:

"The Disciplinary Committee may summon any and all additional witnesses that it may deem necessary in carrying out its functions. Witnesses' statements may be either in writing taken prior to the disciplinary hearing or oral. If the witness's statement is oral, it must be taped. The choice of how the witness's statement is taken will be left to the discretion of the Disciplinary Committee chairman. If the witness's statement is in written form,

the statement must be read into the tape by the Disciplinary Committee chairman."

In short, it is a fair and, indeed, required interpretation of the clear language in Judge Henley's order in this case, and of the ADC's own rules, that they do not contemplate that a Disciplinary Committee will ever be permitted to make a determination of guilt (absent a guilty plea or an admission of guilt) based on information from witnesses without actually receiving into evidence and considering such witnesses' testimony either in oral or written form.

The Court, frankly, finds no justification for the defendants' failure to follow the clear import of Judge Henley's opinion, or the clear and unambiguous language of their own rules.

The Court recognizes that, insofar as the fairness of a particular individual disciplinary adjudication is concerned, the arbitrariness of the decision is a matter of substantive due process, and constitutional violations in this regard turn not on the sufficiency of the evidence but on whether any proper evidence at all was presented. *See Wilwording v. Swenson*, 502 F.2d 844 (8th Cir. 1974); *Willis v. Ciccone*, 506 F.2d 1011 (8th Cir. 1974); *Jackson v. McLemore*, 523 F.2d 838 (8th Cir. 1975). But at some point what is labeled "evidence" cannot serve as the basis for fair factfinding, and to the extent that the holding in this case does in fact amount to a procedural requirement that seeks to ensure that at least some proper evidence be produced before the committee to avoid the stigma of arbitrary action, and thus a violation of substantive due process, then the earlier cases concerning the review of particular disciplinary verdicts must simply be distinguished as not involving similar factual circumstances in the conduct of the hearings. *See generally, Aikens v. Lash*, 514 F.2d 55, 60 (7th Cir. 1975), *vacated* 425 U.S. 947, 96 S.Ct. 1721,

---

**5.** And the Court must emphasize that the constitutional requirements as formulated in this opinion reflect to the best of the Court's ability the appropriate deference to the decisions of prison administrators and gives adequate recognition to the peculiar and restrictive circumstances of penal confinement. *Cf. Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

48 L.Ed.2d 191 (1976). *See also Covington v. Sielaff*, 430 F.Supp. 562, 564–65 (N.D.Ill. 1977); *Frazier v. Ward*, 426 F.Supp. 1354, 1369–70 (N.D.N.Y.1977); L. Tribe, *American Constitutional Law* 559–60 (1978).

In response to the testimony in the hearings in this case, the ADC's assistant director for institutional services issued new, additional regulations concerning disciplinary procedures in memorandum form on February 6, 1978. This memorandum stated:

"Adherence to our present policy on filing a major disciplinary action form will continue to be used in filing major disciplinary reports against inmates. The present form will continue to be used but in filling it out, the charging officer will be specific in informing the inmate in writing of the details of the rule infraction. The charging officer should at least answer who, what, when, where, and why when filling out the major disciplinary form. However, additional procedures to be implemented as as follows:

"1. Attached to the major disciplinary for Disciplinary Court use would be a very indepth [sic] and accurate report from the charging officer concerning the details of the infraction. This statement should be in affidavit form explaining every detail of the particular infraction.

"2. If there are witnesses to the infraction, then their statement should be attached to the employee's affidavit of the incident. These witness statements can be inmates, employees, and/or free world persons who have first hand knowledge of the infraction. Witnesses may be called before the Disciplinary Committee. If so, their statements will be taped. If written witness statements are submitted to the Disciplinary Committee, they will be read into the taped hearing.

"3. It will be the responsibility of the Disciplinary Committee to thoroughly study all the reports at hand concerning the major disciplinary reports. It will be their responsibility to determine whether or not additional investigation should be made into this incident. An extension of time may be given under our present guidelines.

"4. It is mandatory that the Disciplinary Committee initiate an investigation if the charging officer so states or recommends one in his report to the Committee.

"5. The inmate being charged will be placed on administrative segregation, barracks arrest, unassigned status, limited status or back to full duty and responsibilities depending upon the security needs of the institution. This action may be taken during the pending investigation and/or disciplinary hearing by the senior officer on duty, his designee, or the Disciplinary Committee.

"6. It is mandatory that a summary be given as to justification of the Committee finding the inmate not guilty or guilty, specific reasons, justification, cause, etc. must be included in the summary. The statement of Evidence Relied Upon should include whenever appropriate, a short explanation of why information purporting to exonerate the inmate was discounted. It is not sufficient to adopt and copy the exact wording of the disciplinary report.

In assessing the punishment, the Committee will state in Reasons for Assessment for Punishment, why they felt the particular disciplinary warranted the punishment assessed and why the inmate was punished. It is not enough to state, 'nature and seriousness of offense and past history.' The form statement of evidence relied upon for disposition in reasons for disciplinary sanction imposed will be used.

The inmate will receive an oral statement consistent with the requirements outlined above at the time the Committee informs him of their verdict. The Committee will

reduce these reasons to writing prior to the conclusion of that business day and provide a typed copy to the inmate within 24 hours.

"7. It is mandatory that a statement be attached to the disciplinary reporting [sic] justifying why at least one black employee was not a voting member of the Disciplinary Committee. This justification must be in writing and signed by the Chairman of the Disciplinary Committee."

These rules adequately remedy, as a purely administrative and policy matter, the due process problems in the disciplinary process *except* to the extent that the new rules do not require that a guilty verdict always be supported by some "first-hand" statement of somebody, be he informant (as discussed *infra*), inmate, or officer, as discussed *supra*. Other aspects of the rules are discussed *infra*.

Other courts that have considered this problem in any vein have reached contrary results. In *Walker v. Hughes*, 558 F.2d 1247 (6th Cir. 1977), the Court reversed the trial court's holding that the decision of a disciplinary committee must be based upon, and only upon, the evidence, and not on the basis of the accusation itself or on rumor or opinion concerning an inmate's reputation. *See Walker v. Hughes*, 386 F.Supp. 32, 43 (E.D.Mich.1974). The Sixth Circuit held that:

"All the Supreme Court required in Wolff . . ., however, was a 'written statement by the fact finders as to the evidence relied on and reasons.' *Wolff* did not forbid the use of facts not presented at the formal hearing, and *Baxter* . .

stated that such facts could be used. *Wolff* did not pronounce any standards as to adequate evidence. Thus nothing more than a written statement by the Adjustment Committee as to the evidence relied on and reasons therefor could be required by order."

558 F.2d at 1260 (footnotes omitted).[6]

■ The better view, and the view with which the Court generally agrees, is stated in *Green v. Nelson*, 442 F.Supp. 1047 (D.Conn.1977). In that case, the district court held that, "absent justification rooted in correctional policy, prison officials have the affirmative duty to collect written statements from witnesses whose presence is requested by [a charged inmate], but who prison authorities know, or should know, will be unable to attend the hearing." 442 F.Supp. at 1056. Moreover, where the only substantive sources of information before the disciplinary committee were (1) an incident report of the investigating officer containing no witness statements and plainly reflecting no interview of any witnesses, (2) the testimony of the investigating officer, and (3) several telephone calls during the hearing by the chairman to requested staff witnesses, with a determination that their testimony would not be necessary because merely cumulative, the Court held that:

". . . If the telephone calls were unnecessary, then the IDC decision must have been based on the incident report and the petitioner's testimony. It is doubtful, however, that these two sources alone constituted a sufficient basis for the committee's finding. Indeed, the fact that IDC Chairman Moore made the tele-

6. It is of significance that the permitted reliance on matters known through some manner *outside the hearing is not a sanction for arbitrary action* or an indication that the Supreme Court would accept any indication of guilt as constitutionally sufficient. Rather, the Supreme Court stated that:

"Due to the peculiar environment of the prison setting, it may be that certain facts relevant *to the disciplinary determination do not come to light until after the formal hearing*. It would be unduly restrictive to require that such facts be excluded from consideration, inasmuch as they may provide valuable infor-

mation with respect to the incident in question and may assist prison officials in *tailoring penalties to enhance correctional goals*. In so stating, however, we in no way diminish our holding in *Wolff* that 'there must be a "written statement by the factfinders as to the evidence relied on and reasons" for the disciplinary action.' 418 U.S. at 564, 94 S.Ct. at 2979."

*Baxter v. Palmigiano*, 425 U.S. 308, 322–23 n.5, 96 S.Ct. 1551, 1560 n.5 (1967). For the discussion in this case of the requirement that the factfinders issue a written statement, *see infra*.

phone calls suggests that further testimony was needed. More importantly, one of the other IDC members explained during litigation that the telephone calls reinforced the incident report, and served as a basis for the committee's final decision. By excluding the staff testimony as unnecessary, Chairman Moore mistook corroboration for mere redundance. If it appears that a potential witness may offer testimony that will influence the decision of the prison disciplinary committee, that testimony is necessary under *Wolff*, and the witness should be called. Chairman Moore's decision to exclude the testimony of the three staff members thus was not justified by lack of necessity.

"This Court now turns to the alternative justification for the exclusion of witnesses: institutional security. The government does not specify the hazards involved in allowing the petitioner to call the three employees as witnesses. Rather, the government asserts that these potential witnesses were adverse, therefore the petitioner was actually requesting confrontation and cross-examination, and that under *Wolff* the denial of such a request, usually for security reasons, is immune from judicial scrutiny. It is settled law in this Circuit that an inmate has the right to confront and cross-examine adverse witnesses only if the fact-finder cannot otherwise rationally determine the facts. *Cardaropoli v. Norton*, 523 F.2d 990, 998 (2d Cir. 1975); *Catalano v. United States*, 383 F.Supp. 346, 353 (D.Conn. 1974). In the present case, relevant witnesses were available to answer the committee's questions, therefore confrontation and cross-examination were not required.

"The respondents' argument assumes that the right to confront and cross-examine is co-extensive with the right to call witnesses on one's behalf; if there is no right to confront and cross-examine, there is no right to request that the witness be called. This assumption is faulty. The inmate's right to request witnesses in prison disciplinary proceedings includes not merely an opportunity for the inmate or his representative to ask questions of the witnesses, but also the obligation on the part of the disciplinary committee affirmatively to investigate the witnesses' testimony. Prison regulations require that the members of the IDC question requested witnesses, in the absence of a staff representative. Bureau of Prisons Policy Statement 7400.5D(9)(c)(3) (July 7, 1975). The disciplinary committee may also call witnesses in the inmate's absence. *Derosier v. Wilkinson*, Civ. No. B–77–206 (D.Conn. July 6, 1977); *Finney v. Hutto*, 410 F.Supp. 251, 273–74 (E.D. Ark.1976). The dangers inherent in confrontation and cross-examination therefore do not relieve the committee of its responsibility to consider the testimony of a necessary witness. The failure to summon any of the three employees before the IDC was unjustified, and the petitioner's right to present evidence unconstitutionally impaired."

442 F.Supp. at 1057.

While the Court does not hold that requested witnesses must be called in person before the committee, rather than having their statements taken in written form and submitted to the committee, nor that the number of witnesses whose statements must be sought may not in certain situations reasonably be limited, the Court agrees, albeit not in the context of the prisoner's right to present evidence, with the more general holding of *Green* that a certain quantum and type of evidence *is* necessary to sustain factfinding by a disciplinary committee, as indicated *supra.*

The disciplinary committee's closely related and similarly unconstitutional practice is that of relying on informers to find a charged inmate guilty of serious misconduct when neither the informer's statement nor identity is before the committee. This practice is, in the Court's view, merely a more egregious and grievous form of the above problem.

■ Testimony in this case indicated that informants' names are never committed to writing at any stage of the disciplinary

process because of a fear that the confidentiality cannot be maintained due to, among other things, the fact that inmate clerks type the charges and the general nature of the "rumor mill" within the prison. Further, testimony indicated that, just as with other witnesses, informants' written statements are rarely, if ever, submitted to the committee. This practice means, of course, that a prisoner may be deprived of good time, his classification reduced, and subjected to punitive confinement on the basis of an officer's written summarization of what an informant unknown to the committee has said. The "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application" does not demand such an empty procedure. If the disciplinary committee is to rely on informants' statements, it will have to have before it at least the name and actual written statement of the informant,[7] so that the information or charge may be explored, if necessary, by the committee, the informant questioned further, if necessary, and for some minimal assurance that a determination of fact is not based on error or deception.[8] Insofar as this minimal requirement of evidentiary presentation is a burden on the institution's ability to keep secret an informant's identity and information, then the prison officials simply will have to devise and implement better and safer procedures to cope with the situation if they desire to subject inmates to serious sanctions on the basis of informant information. The Court recognizes, too, that to a certain extent the problem of secrecy in this regard is for all practical purposes insolvable. As one court has commented, in doubting the wisdom of the no-confrontation rule:

"No experienced penologist or inmate would seriously contend that the identity of a staff or inmate witness is likely to remain a secret from the accused for very long. The circumstances of any incident giving rise to disciplinary proceedings necessarily limits the potential witnesses to those present. In addition, prison 'grapevines' are much too effective to achieve that degree of secrecy in most instances. Protection against possible retaliation requires more than non-confrontation while its denial may well result in injustice."

*Murphy v. Wheaton,* 381 F.Supp. 1252, 1258 (N.D.Ill.1974). And the answer in this case, then, is not to subject the charged inmate to the risk of error inherent in a no-name, no-statement informant "charge" presented to the committee, but to demand that the committee fulfill its role as a relatively unbiased and prudent factfinder in reaching conclusions with respect to charges of serious misconduct, despite the attendant and ever-present institutional problems of secrecy and order.

Other courts that have considered this general problem have not reached the same conclusions as this Court. In *Nimmo v. Simpson,* 370 F.Supp. 103 (E.D.Va.1974), the district court, in a pre-*Wolff* decision, held that:

" . . . Neither informants themselves nor their written statements need be produced.[2] While fabrication by officers of

 2 "It is not unlikely that persons fearing to appear in person before the Committee might also be afraid to sign written statements incorporating their information. These same persons, however, might nonetheless be willing to make oral statements to guards whom they have taken into their confidence. The Constitution does not deprive the I.C.C. of the opportunity to make use of information so obtained."

purported "informants'" information is possible, that danger does not outweigh the burden upon those charged with maintenance of prison security which would result from denying them the flexibility to make decisions on the basis of oral confidential information. This Court must start with a presumption of good faith on the part of prison officials. Furthermore, it can only be in the interest of

---

7. The charged inmate, of course, has no right to confront and cross-examine an informant against him, nor to know the informant's identity.

8. The new ADC policy of February, 1978, issued in response to the hearings in this case, discussed *supra,* does not meet these standards.

the fair and efficient operation of the state prison system for the state to deal sternly with any of its agents found to abuse the trust necessarily imposed in them. Under the circumstances, the Court finds that the procedural safeguards which plaintiff seeks, direct testimony or written statements of informants, are neither practically available nor constitutionally required.

370 F.Supp. at 106 (footnote omitted).

The problem with this analysis, as indicated *supra*, is that the risk of error and deception in such a procedure is too great comfortably to be borne by a general assumption of good faith on the part of prison officials. Requirements of fairness in law always assume the good faith of responsible officials, but the rule of law itself repudiates the notion that reliance on individuals' inherent good judgment and trustworthiness will ensure that accurate decisions are reached.

In *McLaughlin v. Hall*, 520 F.2d 382 (1st Cir. 1975), the First Circuit Court of Appeals stated that:

"The single question presented on this appeal is whether the board's failure to inquire into the credibility of the informant and the reliability of his information was so fundamentally unfair to the plaintiff as to deprive him of due process. We acknowledge at the outset that we are troubled by the realization that the administrative decision adverse to plaintiff was based exclusively on information allegedly provided by an undisclosed and wholly untested informant. The fact that one gun was found where it was reported to be provides scant corroboration, since the hiding place was in a housing unit other than plaintiff's and there was no independent evidence linking him to the gun. The classification board's guarded language in summing up the evidence against plaintiff offers no reassurance lessening the apprehension that plaintiff's transfer may be directly attributable either to an unintentionally inaccurate report or a maliciously contrived one.

\* \* \* \* \* \*

"Even if we were inclined now to articulate a specific constitutional rule requiring in camera examination, we would regard that path as barred by *Wolff*. We do not label as insubstantial plaintiff's argument that inquiry into the reliability of an informant is necessary to protect an inmate adequately against arbitrary actions by prison officials, *Wolff*, 418 U.S. at 558, 94 S.Ct. 2842. *Wolff* indicates, however, that the development of specific procedural requirements beyond those enumerated in that opinion must be left in the first instance to the sound discretion of corrections authorities. *Id.* at 568–69, 94 S.Ct. 2842. At least for the present, courts should await the results of efforts by prison officials to accommodate institutional requirements to the need for fairness in proceedings which impose upon inmates substantial deprivations."

520 F.2d at 384–85. With this reasoning we must respectfully decline to agree. This Court most definitely does not view the cited passage in *Wolff*, which lies in the context of the confrontation issue, as a direction to the federal courts to consider no constitutional claims involving prison disciplinary procedures except those explicitly addressed in that case.

On the other hand, the same panel of the First Circuit had, six months prior to *McLaughlin*, sanctioned, in the light of *Wolff*, its earlier approval of certain rules from yet another case governing the process due for prisoner transfers acknowledged to be for disciplinary reasons.

"Section IV provides for review by the warden who can approve the board's decision, order further proceedings, or reduce the punishment. Aside from recording the result in the inmate's record, the remainder of the rules indicates only that any decision arrived at must be based on substantial evidence 'manifested in the record of the disciplinary proceeding'. But, as defined, this does not pose a substantial burden on the board, requiring only that 'if any of the facts establishing

a Board determination are derived from an unidentified informant: (1) the record must contain some underlying factual information from which the Board can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement in language that is factual rather than conclusionary and must establish by its specifity [sic] that the informant spoke with personal knowledge of the matters contained in such statement.' This provision establishes that the board has the discretion approved in *Wolff* to foreclose the availability of witnesses and of cross-examination. Any by requiring that a decision be based on the evidence before it, the rules are aimed at preventing arbitrary determinations, which is the major thrust of *Wolff*, which commands 'a written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action. If the written statement is intended to withstand scrutiny and guard against misunderstanding, it cannot indicate reliance on speculation or on facts not in the record."

*Gomes v. Travisono*, 510 F.2d 537, 540 (1st Cir. 1974). As noted *supra*, this Court is going slightly farther to require that a disciplinary committee not rely on informants. who are unidentified to the committee, but the gist of the Court's statement in *Gomes* is correct and in marked variance to that panel's conclusions, without reference to its earlier decision, in *McLaughlin*. Of particular interest is the requirement that the record must contain the informant's statement in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement. Surely this scrutiny is the appropriate approach to *any* witness statement by a disciplinary committee. *See also, Jones v. Institutional Classification Com., Field Unit # 8*, 374 F.Supp. 706, 710–11 (W.D.Va.1974).

At this point, the Court should observe that the conclusion that a rather consistent pattern of imperfect committee adjudications has occurred is confirmed by the testimony and evidence indicating that the committee virtually never probes a case so far as to require the questioning of witnesses in person, and often summarily disregards the contentions of a charged inmate's defense. It should not have to be stated that the Court fully expects the committee in the future to follow its own rules and the requirements of this Court, and thus the above noted indicia of committee behavior will, in all likelihood, see a marked change.

■ The new department rules for disciplinary proceedings, as set out *supra*, establish appropriate guidelines for avoiding *pro forma* statements of reasons for guilt and punishment. The ADC heretofore has failed utterly to conform to the requirements of the Supreme Court in *Wolff*:

". . . Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others. It may be that there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission. Otherwise, we perceive no conceivable rehabilitative objective or prospect of prison disruption that can flow from the requirement of these statements."

418 U.S. at 565, 94 S.Ct. at 2979. The contention that the rote recitation of shorthand phrases may sufficiently meet these important interests of constitutional magnitude is plainly erroneous. *See also, Green v. Nelson*, 442 F.Supp. 1047, 1058 (D.Conn. 1977); *Hayes v. Walker*, 555 F.2d 625, 633

(7th Cir. 1977), *cert. den.* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *Wagner v. Gilligan*, 425 F.Supp. 1320, 1324–25 (N.D. Ohio 1977).

■ The functions of a written record are also fulfilled by the tape recording of the disciplinary hearing, which is required by departmental rules and previous orders in this case. As noted *supra*, however, these tapes are kept only a short time before being re-used, and thus their value for review, in such a setting as this case, for example, is for the most past illusory. Henceforth, these tapes shall carefully be kept, filed, and maintained by the ADC indefinitely subject to this Court's later order setting a minimum retention period.

■ Last, but certainly not least in this litany of disciplinary hearing abuses, is the depressing evidence of the breakdown in the entire process wherein high prison officials have ordered verdicts of guilty and have "suggested" certain punishments to members of the committee. Little needs to be said of such a situation except that it unfortunately adds to a long and sad history of abuse at the Arkansas Department of Correction and ultimately works in direct contravention of the efforts of the dedicated and professional officers of the department. The best rules, the fairest procedures cannot prevent this type of abuse. When arrogant, unprincipled, and evil men are in control, the rule of law becomes meaningless. Having no respect for the law or the rights of others, they quickly devise schemes to "get around" these barriers to the imposition of their own wills. And this, sadly, according to the undisputed evidence, happened here in Arkansas in the year 1977. Fortunately, the evidence indicates that this sickness was not widespread in terms of the number of defendants' personnel involved. And the courts must recognize that aberrations do occur. Evil men do find their way into positions of power and then operate contrary to their employers' own rules and regulations and, indeed, unlawfully. This case does not deal with the harm done individuals as a result of this subversion of the disciplinary system. But we must keep such instances in mind as we attempt to identify the minimum procedures required in the disciplinary context.

As a final note, it is appropriate for the Court to observe that the requirements of constitutional due process, in the long run, can only aid prison officials in their quest for internal order in the institution. Although the Supreme Court has recently tended to emphasize only the utilitarian value of using certain procedures (the insuring of the accuracy of a governmental decision or action), nevertheless there remains a profound value in the *concept* of due process that is an expression of the very rule of law, the intrinsic value in the appearance of justice.

"Justice Frankfurter captured part of this sense of procedural justice when he wrote that the 'validity and moral authority of a conclusion largely depend on the modes by which it was reached. . . No better instrument has been devised for arriving at the truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.' [*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).] At stake here is not just the much-acclaimed *appearance* of justice but, from a perspective that treats process as intrinsically significant, the very *essence* of justice."

L. Tribe, *American Constitutional Law* 503 (1978). This intrinsic value in the concept of due process is of great importance in the prison setting, in this Court's opinion, because the arbitrary treatment of inmates gives rise to the same (or greater) disorder and discontent as that which occurs whenever human beings are unfairly treated. To this Court, it seems not such a hard lesson to learn: basic fairness by prison officials will, in the long run, greatly simplify their management problems and enhance the possibility of attaining their cor-

rectional goals. It is well that we once again remind ourselves that prisoners are incarcerated not for punishment but as punishment.

Judgment pursuant to this opinion will be entered accordingly.

## APPENDIX

## ARKANSAS DEPARTMENT OF CORRECTION

MEMORANDUM

TO: Mr. Jim Mabry, Director

FROM: A. L. Lockhart

RE: Investigation of Disciplinary Procedures at the Cummins Unit

DATE: May 25, 1978

It was reported to me that possibly a Disciplinary Committee Chairman at the Cummins Unit, on at least one occasion, had been instructed as to what action to take during Disciplinary Court. As a result of this information, I conferred with Mr. Robert Lyford and Mr. James Smedley of the Attorney General's Office. We concurred that this type action could not be condoned and would necessitate an investigation.

The information received was that Mr. Ross Martin, Personnel and Training Officer at the Cummins Unit, had stated that on one occasion he had received a list of eight inmates from Mr. Mike Hawke, then Warden of the Cummins Unit, indicating guilt or innocence and the proposed amount of punishment that be given to the inmate. I first interviewed Mr. Ross Martin on April 26, 1978 concerning this matter. It was determined that Mr. Martin had been a voting member of the Disciplinary Committee on numerous occasions. He had also been appointed as Chairman Designee on numerous occasions. Mr. Martin stated that on September 26, 1977 he had received a list from Mr. Hawke indicating the guilt or innocence of eight inmates. This list also gave the type punishment that could be administered to these inmates. I also found that Mr. Martin had never received any more lists from anyone else indicating the guilt or innocence of any inmate appearing before the Disciplinary Committee. Mr. Martin also stated that Mr. Lagrone and Mr. Monks, the Assistant Wardens of the Cummins Unit, had also given him a list of inmates indicating what punishment would be assessed. It was stated this occurred approximately 20–25 times. A definite date could not be determined as to when this list for punishment was given to Mr. Martin.

I interviewed each Disciplinary Committee member that sat on Disciplinary Committee on September 26, 1977. These employees clearly stated that they were unaware of any lists being given to Mr. Martin. They were also unaware of any pressures being applied to them to vote a specific way either for guilt or innocence. These employees also stated that the amount of punishment handed down was their honest recommendation and that it was decided by a majority rule as to what action should and would be taken. The employees could not verify that Mr. Martin had a list of inmates to be punished and what action to be taken in the disciplinary hearing nor could they verify whether or not Mr. Martin pressured them or attempted to pressure them into making a certain decision.

However, on another occasion Mr. Martin, Disciplinary Chairman Designee, had found an inmate guilty and could not determine what punishment to be handed down. It was reported that Mr. Martin made telephone contact with Mr. Hawke and advised Mr. Hawke of the problem the committee was having and sought Mr. Hawke's advice. He advised Mr. Martin. It relayed to the other voting members of the committee. The members stated they discussed the recommendations given to Mr. Martin. After this discussion, the committee members voted as to what punishment was to be assessed. It was their feeling the punishment assessed was their recommendation and not solely Mr. Hawkes'. At this point, I began interviewing Disciplinary Committee Chairmans confirming if they had also been given a list of inmates indicating what action should be taken in Disciplinary Court. Af-

ter interviewing approximately 20 employees who had sat as either Disciplinary Committee Chairmans, Committee Chairman Designee, or Voting Members, I found that Mr. John Robinson, Treatment Coordinator at the Cummins Unit, and a Committee Chairman Designee had been given a list on one or maybe two occasions indicating the guilt or innocence of an inmate. However, he stated this list was not followed in Disciplinary Court by him or the Disciplinary Committee in taking action against the inmate. However, Mr. Robinson did state that he made the voting members aware of Mr. Hawke's instructions. He did feel that the Committee found the inmate guilty from the information presented to the Committee. He stated this list was given to him by Mr. Hawke. Mr. Hawke was then the Assistant Warden at Cummins. Mr. Robinson stated that no more than ten names were on the list that he recalls nor could he recall exactly when this occurred other than either July or August of 1975.

I also interviewed Mr. Hawke who stated that he did not give a list to anyone that contained information indicating which inmates were to be found guilty or not guilty. However, he did state that he had talked to the Chairman or the Chairman Designee advising them as to what punishment would be appropriate if the inmates were found guilty. Mr. Hawke stated he made this recommendation due to his past experience in corrections and knowing the inmate and his history.

I also interviewed Mr. Monks in reference to the comments made by Mr. Martin and Mr. Robinson. Mr. Monks' statement was to the effect he had never given any employee who was a member of the Disciplinary Committee instructions on whether to find an inmate guilty or not guilty. However, he did state that he had given Mr. Ross Martin, on several occasions, and Mr. John Robinson on a couple of occasions, a list indicating what punishment could be given if the inmate was found guilty. The Disciplinary Committee would take his recommendations by concurring with it or make their own decision. He stated that in no way did he dictate to the Disciplinary Committee.

In Mr. Lagrone's report, he stated that he had never instructed anyone to find an inmate guilty in Disciplinary Court nor had he ever instructed anyone as to what punishment to assess an inmate if found guilty.

I next began interviewing employees who had been involved in the Disciplinary Court hearings to determine if they could substantiate any of the claims made by Mr. Martin or Mr. Robinson. I found that Mr. Raymond Mangum sat as a voting member of the Disciplinary Committee on a few occasions. Mr. Mangum stated that one time he had seen a list with three names on it when Mr. Ross Martin was Chairman Designee of the Disciplinary Committee. He stated he did not recall the names of the inmates nor did he recall the time that it occurred. He also was able to substantiate the fact that Mr. Martin had called Mr. Hawke and asked his advice on how to handle the punishment to be assessed on an inmate after finding him guilty.

However in my interview with Mr. Ross Martin, he was unable to recall the incident that Mr. Mangum referred to. He stated he did not think that happened but it possibly could have and he just did not remember it.

Also in my interviewing, I interviewed Mr. Larry Norris, presently the Assistant Warden at the Cummins Unit for Treatment. In interviewing Mr. Norris, he felt that he possibly had seen a list on one occasion when Mr. John Robinson was Chairman Designee. He thought it was a list indicating the inmate's name and what could be done to the inmates following policy and guidelines as to the amount of punishment that can be assessed. Mr. Norris did not recall the time this occurred other than the last part of 1976.

From all my interviews with the different employees, I have been able to determine that Mr. Ross Martin and Mr. John Robinson actually possessed a list of inmates. After my investigation, I was able to determine that the other voting members of the Disciplinary Committee were unaware of

definite guidelines to be followed that Mr. Martin and Mr. Robinson said they had. I feel that the voting members of the Disciplinary Committee voted their own conscious after listening to all the facts and going through the documentation they had at the Disciplinary Hearing.

As a result of this information, I would like to recommend that I have the opportunity to evaluate each policy in existence, propose new policies that will assure us that the handling of Disciplinary Court will be done in a very professional manner. I feel that we can implement guidelines to insure that each inmate appearing before the Disciplinary Committee will receive the most expeditious and fairest hearing possible.

In conclusion, I feel that the employees involved in Disciplinary Court were totally ignorant and unaware of any wrongdoings that they may have caused. They were not maliciously involved in any activity that disregarded the inmate's safety and his justice in the disciplinary process. I do not feel that the inmates have been or were adversely affected by what Mr. Martin and Mr. Robinson said they received from Mr. Hawke, Mr. Lagrone and Mr. Monks. I feel that the Disciplinary Committee members voted the way they felt at that time. I am also aware that the Chairman of the Disciplinary Committee could possibly have persuaded or swayed the other voting members in voting the way that it was recommended to him to vote. However, the other voting members of the Disciplinary Committee all stated they voted from the facts at hand rather than any information given to them or pressures that may have been applied directly or indirectly to them to vote a certain way. I feel that our policy that has been in effect is a policy that came from the United States Supreme Court's decision on Disciplinary Court hearings. I feel that our policy, that has been in effect, follows the guidelines of the other court decisions that have dealt with Disciplinary Court proceedings. Even though the appearance of wrongdoings was present, I cannot condone those actions. With the implementation of new policies and guidelines, I feel we can remove the appearance of any wrongdoings.

I would also like to recommend that immediate steps be taken to implement command influence policy whereas the employees will not be influenced by other staff members as to what action will be taken against any inmate that may be appearing or is appearing before the Disciplinary Committee. I feel that this is the only immediate step that should be taken at this time. However, I am proposing other policy changes which will be forthcoming.

I also feel that the number of inmates that have appeared before the Disciplinary Committee and the number of employees that have been involved in Disciplinary Committee hearings are such a number that it would be totally impossible to review each and every disciplinary and determine whether or not any wrongdoings were held during Disciplinary Court sessions that did adversely affect the inmate. I honestly feel that no unreasonable amount of punishment has been handed down as a result of the list being given to the Disciplinary Chairman (Designee).

I would like to personally investigate the actions taken on September 26, 1977 in an effort to determine whether or not these inmates should have been found guilty or not guilty and received the proper amount of punishment for the offense they committed. I feel that I would be able to interview each and every inmate or employee that could have information pertaining to the individual inmate's disciplinary. Once I review and investigate each disciplinary, I would like to file a written report as to the concurrence of the disciplinary action taken or either recommend alternate punishment after the facts are fully presented.

ALL:ntSP